55 A.3d 37

**Dennis WHITLEY III, et al.,**

**v.**

**MARYLAND STATE BOARD OF ELECTIONS, et al.**

**No. 133, Sept. Term, 2011.**

Court of Appeals of Maryland.

Oct. 23, 2012.

134

Jonathan S. Shurberg (Jonathan S. Shurberg, P.C., Silver Spring, MD), on brief, for appellants.

Joseph E. Sandler (Amanda S. La Forge and Elizabeth F. Getman of Sandler, Reiff, Young & Lamb, P.C., Washington, DC), on brief, for appellants.

Julia Doyle Bernhardt, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Jeffrey L. Darsie, and Jennifer L. Katz, Asst. Atty. Gen., Baltimore, MD), on brief, for appellees.

Paul J. Orfanedes (Chris Fedeli of Judicial Watch, Inc., Washington, DC), on brief, for appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, McDONALD, JJ.

HARRELL, J.

This case comes to us through the courtesy of fairly recent advancements in the field of information technology,[1] as applied to the increasingly popular use in Maryland of voter petitions seeking to place questions before the electorate on a ballot. *See generally* Md.Code (2002, 2010 Repl.Vol.), Election Law Article, §§ 7–101–7–105; *Doe v. Md. State Bd. of Elections*, 428 Md. 596, 53 A.3d 1111 (2012) (also representing computer-facilitated petitions to submit the Maryland Dream Act to referendum on the 2012 election ballot). Following the passage of Maryland's latest congressional redistricting law, enacted by the General Assembly in an October 2011 special session as Senate Bill 1, chapter 1 (pursuant to the results of the 2010 United States Census) (hereinafter SB 1), Intervenor, MDPetitions.com, employed a website-based initiative to gather the signatures necessary to petition SB 1 to referendum on the general election ballot in November 2012.[2] The site's

---

1. I feel an attack coming on of "[t]he technological heebie jeebies," something that happens every time a neo-luddite, such as myself, encounters an emerging technology. *See Griffin v. State*, 419 Md. 343, 367 & n. 3, 19 A.3d 415, 430 & n. 3 (2011) (Harrell, J., dissenting).

2. The Maryland Constitution reserves to the people the right of referendum. The people may petition to referendum any Act passed by the

computer software allowed a user to generate electronically a petition signature page by entering his or her identifying information [3] in specified fields on the website. The registered voter then could print the page, affix his or her signature, complete the required petition circulator's affidavit attesting to the genuine nature of his or her signature,[4] and submit it to the petition sponsor in support of referring SB 1 to the ballot.

The Maryland State Board of Elections (hereinafter "the State Board") certified the petition for referendum on 20 July 2012 after determining that Intervenor had gathered the

---

General Assembly, if supported by the signatures of three percent of the registered voters of the State, as determined by the total number of votes cast in the preceding gubernatorial election. Md. Const. art. XVI, § 1, 3(a).

3. Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–203(a) requires that the petition signer submit certain identifying information along with his or her signature to support a petition for referendum. Specifically, it states:

a) In general.—To sign a petition, an individual shall:
(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and
(2) include the following information, printed or typed, in the spaces provided:
(i) the signer's name as it was signed;
(ii) the signer's address;
(iii) the date of signing; and
(iv) other information required by regulations adopted by the State Board

4. The Maryland Constitution and Election Law Article require that an affidavit be attached to each signature page submitted in support of a petition for referendum. Article XVI, § 4 of the Maryland Constitution provides, in relevant part:

There shall be attached to each paper of signatures filed with the petition an affidavit of the person procuring those signatures that the signatures were affixed in his presence and that, based upon the person's best knowledge and belief, every signature on the paper is genuine and bona fide and that the signers are registered voters at the address set opposite or below their names.

The Election Law Article further requires that "[e]ach signature page shall contain an affidavit made and executed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed." Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–204(a).

required number of valid signatures. Pursuant to Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–209, Petitioners [5] (hereinafter "Whitley") filed a Complaint for Declaratory and Injunctive Relief in the Circuit Court for Anne Arundel County,[6] challenging the State Board's certification of the petition on the grounds that Intervenor failed to submit a sufficient number of valid signatures. Specifically, Whitley objected to two classes of signatures that were validated by the State Board, the invalidity of either of which would render the petition insufficient to place SB 1 on the ballot. First, Whitley contended that signature pages obtained through the use of MDPetitions.com were invalid under § 6–203 of the Election Law Article and the State Board's own regulations because the computer program or the recruiting household member, rather than the individual signer, "included" or "provided" the individual's identifying information. Second, Whitley objected to signature pages that were signed by the voter twice—once as the signer pledging support for the petition and again as the circulator attesting that the signature of the signer was valid—as contrary to the plain language of the affidavit requirements of Article XVI, Section 4 of the Maryland Constitution and § 6–204 of the Election Law Article.

The Circuit Court affirmed the action of the State Board, determining that the applicable constitutional and statutory provisions were unambiguous and did not support Whitley's contentions. We issued a writ of certiorari to consider two issues: (1) whether petition signatures obtained through the use of a third-party website violate the statutory requirement

**5.** Petitioners are five Maryland registered voters: Dennis Whitley III, Anne Neal, Karren Jo Pope–Onwukwe, Joanna Hanes–Lahr, and Matthew Thomas. The Maryland Democratic State Central Committee was initially joined as a plaintiff, but was dismissed by the trial court for lack of standing.

**6.** Whitley named the Maryland State Board of Elections, Secretary of State John P. McDonough, and State Administrator of Elections Linda H. Lamone as defendants. MDPetitions.com intervened as a defendant. Hereinafter, these parties will be collectively referred to as Respondents.

that an individual "include" or "provide" his or her identifying information, *see* Md.Code, (2002, 2010 Repl.Vol.), Election Law Article, § 6–203; COMAR 33.06.03.06; and (2) whether an individual can "self-circulate" a petition by signing both as the voter and as the circulator consistent with the affidavit requirements of the Maryland Constitution and Election Law Article. *See* Md. Const. art. XVI, § 4; Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–204. On 17 August, 2012, we issued an Order affirming the judgment of the Circuit Court.[7] We shall elaborate now our reasons for that Order.

## FACTUAL AND PROCEDURAL BACKGROUND

Article XVI, Section 1 of the Maryland Constitution reserves to the people the power to petition to referendum any Act, or any part of an Act, passed by the General Assembly (if approved by the Governor) or passed over the Governor's veto. Md. Const. art. XVI, § 1. To proceed to referendum, a petition must be filed with the Secretary of State, Md. Const. art. XVI, § 2, bearing the signatures of three percent of the registered voters of the State as determined by the total number of votes actually cast in the preceding gubernatorial election.[8] Md. Const. art. XVI, § 3(a). Each signature page accompanying the petition must include an "affidavit of the person procuring those signatures that the signatures were affixed in his presence and that, based upon the person's best knowledge and belief, every signature on the paper is genuine and bona fide and that the signers are registered voters at the

---

7. The Order stated:

> For reasons to be stated in an opinion later to be filed, it is this 17th day of August, 2012,
>> ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the judgment of the Circuit Court for Anne Arundel County be, and it is hereby, affirmed. Costs to be paid by the Appellants. Mandate to issue forthwith.

8. To qualify for referendum, not more than half of the required signatures on the petition can be of residents of Baltimore City or of any one county. Md. Const. art. XVI, § 3(a).

address set opposite or below their names." Md. Const. art. XVI, § 4. Upon a determination of sufficiency, the petitioned Act is submitted to the registered voters of the State on the ballot for their approval or rejection. Md. Const. art. XVI, § 1.

On 20 October 2011, the Maryland General Assembly enacted Senate Bill 1, chapter 1 of the 2011 Special Session, signed by Governor O'Malley that same day. SB 1 established a congressional redistricting plan for Maryland's eight congressional districts, pursuant to the results of the 2010 U.S. Census.[9] Following its passage, Intervenor, MDPetitions.com, initiated an effort to collect at least the 55,736 signatures required to subject SB 1 to referendum on the 2012 general election ballot, pursuant to Article XVI of the Maryland Constitution and Title 6 of the Election Law Article.[10] On 26 March 2012, Intervenor received from the State Board an

---

**9.** SB 1 was challenged in the federal courts on the grounds that it violated Article I, § 2, of the U.S. Constitution, the Fourteenth and Fifteenth Amendments of the U.S. Constitution, and § 2 of the Voting Rights Act of 1965. A three-judge panel of the United States District Court for the District of Maryland determined that SB 1 is constitutional and does not violate the Voting Rights Act. *Fletcher v. Lamone*, 831 F.Supp.2d 887, 897, 900 (D.Md.2011), *aff'd*, —— U.S. ——, 133 S.Ct. 29, 183 L.Ed.2d 671, No. 11–1178, 2012 WL 1030482 (June 25, 2012).

**10.** The ability of a citizen to seek referendum is established by Article XVI, Section 1 of the Maryland Constitution, which provides:

(a) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, or, if passed by the General Assembly over the veto of the Governor;

(b) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted.

Md. Const. art. XVI, § 1. To subject a law to referendum, the Maryland Constitution requires the signatures of "three percent of the qualified voters of the State of Maryland, calculated upon the whole number of votes case for Governor at the last preceding Gubernatorial election, of whom not more than half are residents of Baltimore City, or of any one County." Md. Const. art. XVI, § 3. According to the Maryland State Board of Elections, the requisite number of signatures, based upon the 2010 Gubernatorial election, is 55,736.

advance determination of the sufficiency of the format of their proposed petition pursuant to Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–202.[11]

For a signature to be accepted as valid by the State Board, it must comply with the provisions of the Maryland Constitution and Title 6 of the Election Law Article.[12] Each paper submitted as part of a petition must "contain the full text, or an accurate summary approved by the Attorney General, of the Act or part of Act petitioned." Md. Const. art. XVI, § 4; Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–201(c)(2) (requiring that a petition seeking to place a question on the ballot contain either "(i) a fair and accurate summary of the substantive provisions of the proposal; or (ii) the full text of the proposal"). Additionally, a valid signature page must include a description of the petition's subject and purpose, a statement of the signer's support and status as a registered voter, spaces for signatures and signer information, and a space for the required affidavit to be made and executed by the petition circulator.[13] Election Law Article, § 6–201(c).

---

**11.** Section 6–202 states, in relevant part: "The format of the petition prepared by a sponsor may be submitted to the chief election official of the appropriate election authority, in advance of filing the petition, for a determination of its sufficiency." Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–202(a). Previously, Intervenor asked the State Board for an advance determination of sufficiency, but the State Board required revisions to Intervenor's petition materials before eventually granting the advance determination.

**12.** The General Assembly is authorized to enact statutes to further define the petitioning process, pursuant to Md. Const. art. XVI, § 4, which states in relevant part, that "[t]he General Assembly shall prescribe by law the form of the petition, the manner for verifying its authenticity, and other administrative procedures which facilitate the petition process and which are not in conflict with this Article." Md. Const. art. XVI, § 4. The State Board has the authority to "establish the process to be followed by all election authorities for verifying and counting signatures on petitions." Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–207(b).

**13.** A circulator is "an individual who attests to one or more signatures affixed to a petition." Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–101(d). Within the Election Law Article, an affidavit is defined as "a statement executed under penalty of perjury." § 6–201(b).

In completing a signature page, each signer of a petition must "include . . . , printed or typed," his or her name, address, and the date the petition was signed.[14] Election Law Article, § 6–203(a). The signature page must also include "an affidavit of the person procuring those signatures that the signatures were affixed in his presence and that, based upon the person's best knowledge and belief, every signature on the paper is genuine and bona fide and that the signers are registered voters at the address set opposite or below their names." Md. Const. art. XVI, § 4. If the affidavit, "made and executed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed," Md.Code (2002, 2010 Repl. Vol.), Election Law Article, § 6–204, is not included, the signature will be deemed invalid. Election Law Article, § 6–203(b)(4).

Intervenor collected petition signatures both in person and through the use of a website that allowed visitors to the site to enter relevant identifying information to generate their own copy of a referendum petition, which could then be printed, signed, and mailed to the petition sponsor. To use the petition computer software, an individual could visit MDPetitions.com, select the "redistricting petition" option, and follow a series of prompts to complete the petition. After selecting the redistricting option, the website first displayed a screen which included a picture of the new congressional districts as defined by SB 1, a summary of Intervenor's concerns regarding SB 1 and Intervenor's call to action,[15] and the option to either "Sign the petition now" or "Get a volunteer packet."

---

**14.** Although Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–203(a) also provides that the signer shall provide any additional information required by the State Board, the regulations of the State Board require only that when signing the signature page, the signer sign his or her name as required by § 6–203(a)(1), and "[p]rovide the following information, to be printed or typed in the appropriate spaces: (a) Date of signing, (b) Signer's name as it was signed, and (c) Current residence address, including house number, street name, apartment number (if applicable), town, and ZIP code." COMAR § 33.06.03.06(2).

**15.** Specifically, the screen posed the rhetorical question, "Why should I care about redistricting?" It then included the following statement:

An individual who elected to sign the petition would then be taken to a screen that provided instructions on how to generate a petition. On the left side of the screen was a five-step instruction process, which stated:

Maryland has strict rules regarding how the petition is filled out. This site will help insure that your petition is filled out in 5 easy steps.

Step 1—Provide information requested on the petition, as indicated to the right.

Step 2—Select members of your household who might also want to sign the petition.

Step 3—Download the petition

Step 4—Print the petition

Step 5—Sign and date the petition.

On the right side of the screen, a series of boxes appeared in which the individual could enter his or her identifying information, as instructed in Step 1. The screen prompted, "Fill out the following form with your information," and included the following fields for the individual to complete: first name, last

---

Career politicians would like to tell you that redistricting doesn't matter and that we should just accept the crazy congressional redistricting lines that they've drawn for us.

In fact, redistricting affects every household in the state. Maryland should have districts that represent communities and groups of people. As an example, a district should allow the City of Baltimore to be represented by a congressman devoted to their causes, Anne Arundel County to theirs, Prince George's County to their causes and so on.

Maryland's approved Congressional map purposefully spreads out minority votes so that they cannot compete with establishment politicians. African American and Hispanic Districts are split up to keep white-establishment liberals in control and to minimize minority voting power. Rural voters and Republicans are combined into one large area in District 1 and then separated and combined with densely-populated urban areas in other districts to snuff out their voting power.

The map needs to give fair representation to all, and we have the power to overturn this severely gerrymandered map through the referendum process. Let's demand true representation and overturn the current map by *signing the petition today.*

name, suffix (optional), email address, phone number, zip code (5 digit), and birth date. After filling in the relevant information and clicking "Continue," the software program would search the most recent voter registration rolls made available by the Maryland State Board of Elections to identify the user's status as a registered Maryland voter. Assuming that the software was able to identify the user as a registered voter,[16] a screen displaying the names of all of the Maryland voters registered at the address entered would appear. The user was instructed to deselect the name of any registered voter at the address who did not wish to sign the petition by clicking a box appearing next to the voter's name. After clicking "Continue," the user could then select a button labeled "Download a petition" to download his or her personal petition. The screen contained the following instructions:

Step 1—Download the petition, you may need to save the file to your computer in order to open it

Step 2—Open the File which includes the petition, a self-addressed envelope, and a copy of the bill

Step 3—Print the petition. The first two pages need to be printed on both sides of 1 page.

A) To do this without a duplex printer, print just page 1.

B) Then insert the paper upside down in the manual feeder and print just page 2.

---

**16.** If the user was not a registered Maryland voter, had entered his or her information incorrectly, or if the information entered did not match that included on the State Board's voter registration rolls, an error screen appeared, which stated:

Oops, we couldn't find you

This could happen for a couple of reasons:

1. You are not registered to vote in Maryland. If this is the case, you could register to vote and then sign the petition after you get your voter card.

2. The zip code you provided doesn't match the zip code in the voter database.

3. The name entered does not match the name provided to the Board of Elections when you signed up. As an example, Debra may be required instead of Debbie.

If you feel that you've reached this message in error, please contact us.

C) Select pages 3–7 and print as normal

Step 4—Sign and date the petition by your name, have others on the page sign, then sign and date as the circulator last.

A) A copy of the actual 4–page bill needs to be available every time someone signs the petition.

NOTE: Unlike other petition efforts, this petition does not have the full bill on the back of the petition, but page 2 is an approved summary of the bill.

Once the user downloaded the petition, he or she could open the petition and print his or her signature page, the summary of SB 1 and accompanying map, the complete text of SB 1, and a foldable envelope for use in mailing the completed signature page to the sponsor, MDPetitions.com.

Intervenor submitted 28,477 signatures to the State Board on 31 May 2012, 26,763 of which were accepted as valid by the Board. Intervenor submitted an additional 36,267 signatures on 30 June. As of 18 July, the Board accepted 59,201 signatures and rejected 7,649, thus validating and verifying more than the number of signatures necessary to submit SB 1 to referendum. As a result, in a letter dated 20 July 2012,[17] the State Board granted final certification to Intervenor's petition, pursuant to Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–208(b).[18]

After the petition was certified for the November 2012 general election ballot, five registered Maryland voters

---

**17.** The State Board had 2 business days following the completion of the verification and counting process to make the certification decision. Md.Code (2002, 2010 Repl.Vol.), Election Law Article, §§ 6–208(c), 6–210(d).

**18.** § 6–208 states, in relevant part:

(b) *Certification.*—If the chief election official determines that a petition has satisfied all requirements established by law relating to that petition, the chief election official shall certify that the petition process has been completed and shall:

(1) with respect to a petition seeking to place the name of an individual or a question on the ballot, certify that the name or question has qualified to be placed on the ballot.

("Whitley") challenged the validity of the petition's certification by filing a Complaint for Declaratory and Injunctive Relief under Section 6–209 [19] of the Election Law Article in the Circuit Court.[20] The complaint alleged that because two categories of petition signatures failed to meet the requirements of Article XVI of the Maryland Constitution and the Election Law Article, the State Board's certification decision was based on an insufficient number of signatures and should be reversed. First, Whitley contended that the approximately 7,578 signatures obtained through the electronic generation of a petition through the mechanisms of MDPetitions.com failed to satisfy the requirement of Election Law Article, § 6–203(a) and COMAR 33.06.03.06(B) [21] that the petition signer "include"

---

**19.** Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–209(b) provides that, "[p]ursuant to the Maryland Uniform Declaratory Judgments Act and upon the complaint of any registered voter, the circuit court of the county in which the petition has been or will be filed may grant declaratory relief as to any petition with respect to the provisions of this title or other provisions of law." Intervenor contends that Whitley (1) failed to establish that the voters challenging the certification are, in fact, registered voters; and (2) does not meet the requirement of Md.Code (1973, 2006 Repl.Vol.), Courts & Judicial Proceedings Article, § 3–409 that there be an actual controversy, antagonistic claims, or a legal relation, status, right, or privilege. Intervenor's arguments are without merit. First, voter registration rolls are public records and the State Board concedes that Petitioners are registered voters. Second, we conclude that there is a justiciable controversy. Whitley contends that the State Board misinterpreted and misapplied the constitutional and statutory provisions pertaining to the referendum process, thus certifying a petition for referendum that does not, in fact, merit certification. Because of the broad grant of authority afforded to registered voters under § 6–209(b) of the Election Law Article, we determine that Whitley has standing properly under § 6–209(b).

Because Whitley has standing under the broad provisions of § 6–209(b) (and we can reach fairly and decide the dispositive questions through that vehicle), we decline to consider Intervenor's standing challenge to Whitley's request for judicial review under § 6–209(a).

**20.** The Maryland Democratic Central Committee was initially joined as a plaintiff, but was dismissed from the action, as challenged by Intervenor, by the Circuit Court in its Memorandum Opinion on the grounds that it did not have standing.

**21.** COMAR 33.06.03.06(B) provides:
When signing the signature page, each signer shall:

or "provide" his identifying information. Second, Whitley asserted that the approximately 14,254 signature pages [22] on which the registered voter attested to his or her own signature as the circulator are invalid in violation of Article XVI, Section 4 of the Maryland Constitution and Election Law Article, § 6–204(a) in that the circulator's required affidavit was not "affixed in [the] presence" of the person "procuring" the petition signatures. Whitley sought a declaration that the petition did not satisfy the legal requirements for certification of a petition to referendum, requested that the Circuit Court reverse the State Board's certification decision, and asked the court to enjoin the Secretary of State from preparing and certifying SB 1 to the State Board, pursuant to Election Law Article, § 7–103(c)(1).[23]

Whitley, the State Board, and Intervenor filed cross-motions for summary judgment. A hearing was held on 10 August 2012 in the Circuit Court to consider these motions. The court entered summary judgment in favor of the State

---

(1) Sign the individual's name as it appears on the Statewide voter registration list or the individual's surname of registration and at least one full given name and the middle initials of any other names; and

(2) Provide the following information, to be printed or typed in the appropriate spaces:

(A) Date of signing,

(B) Signer's name as it was signed, and

(C) Current residence address, including house number, street name, apartment number (if applicable), town, and ZIP code.

22. Neither the State Board nor Intervenor concede the accuracy of Whitley's calculation of the number of petitions falling into either category of challenged signatures; however, the State Board stated in its Answer that "at least 5,000" signatures fell into each category. As a result, if either category of signatures were to be found invalid under the Constitution or Election Law Article, there would be an insufficient number of signatures to submit SB 1 to referendum.

23. Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 7–103(c)(1) instructs the Secretary of State to "prepare and certify to the State Board, not later than the third Monday in August," the question to be placed on the ballot "for all statewide ballot questions and all questions relating to an enactment of the General Assembly which is petitioned to referendum."

Board,[24] affirming the certification decision and approving the methodology by which the petition signatures were gathered. Specifically, the court determined that computer-generated petitions complied with the requirements of § 6–203 because the statute fails to specify the method by which a signer must "include" his or her identifying information. Further, the court found that because neither the Maryland Constitution nor § 6–204 of the Election Law Article contains an express requirement that an individual other than the petition signer serve as the circulator, self-circulating petitions are not invalid presumptively.

Whitley noted an appeal to the Court of Special Appeals and filed contemporaneously a petition for writ of certiorari with this Court. Prior to any proceedings in the intermediate appellate court, we issued a writ of certiorari. *Whitley v. Md. State Bd. of Elections*, 427 Md. 523, 50 A.3d 9 (2012). We heard oral arguments on 16 August 2012, and the next day, on 17 August 2012, we issued a Per Curiam Order affirming the judgment of the Circuit Court for Anne Arundel County. We shall explain now our reasons for that action.

## DISCUSSION

We are asked here to consider the following two questions: (1) Does allowing a petition sponsor's computer program to pre-fill the signer's identifying information on the petition form violate the requirement of Md.Code Ann., Elec. Law Sec. 6–203(a) that the individual signer shall "include" that information and/or the requirement of the State Board's regulation, COMAR Sec. 33.06.03.06B(1) that the signer shall "[p]rovide" such information?
(2) Does allowing a circulator of a referendum petition to attest to his or her own signature violate the requirement of Md. Const., Art. XVI Sec. 4 that each petition must have

---

**24.** The Circuit Court denied Whitley's motion for summary judgment. The court granted Intervenor's motion for summary judgment on the merits, but denied summary judgment based on the assertion that Whitley lacked standing to challenge the State Board's certification.

attached "an affidavit of the person procuring those signatures that the signatures were affixed in his presence;" and/or the requirements of Md.Code Ann., Elec. Law Sec. 6–204(a) that the affidavit be "made and executed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed"?

On review of an order granting summary judgment,[25] this Court reviews the record to determine whether any material facts are in dispute. *Md. State Bd. of Elections v. Libertarian Party*, 426 Md. 488, 505–06, 44 A.3d 1002, 1012 (2012); *Doe v. Montgomery Cnty. Bd. of Elections*, 406 Md. 697, 711, 962 A.2d 342, 350 (2008). "The record is reviewed 'in the light most favorable to the non-moving party and [we] construe any reasonable inferences that may be drawn from the well-pled facts against the moving party.'" *D'Aoust v. Diamond*, 424 Md. 549, 574, 36 A.3d 941, 955 (2012) (quoting *Muskin v. State Dep't of Assessments & Taxation*, 422 Md. 544, 554–55, 30 A.3d 962, 968 (2011)); *Rhoads v. Sommer*, 401 Md. 131, 148, 931 A.2d 508, 518 (2007). If no genuine dispute of material fact exists, this Court determines "whether the Circuit Court correctly entered summary judgment as a matter of law." *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.*, 404 Md. 560, 571, 948 A.2d 11, 18 (2008) (citations omitted); *Doe*, 406 Md. at 711, 962 A.2d at 350. "Whether a trial court properly applied this standard is a question of law, which we review [without deference]." *Rhoads*, 401 Md. at 148, 931 A.2d at 517–18. There are no genuine disputes of material fact.[26] Rather, the parties' dis-

---

**25.** Pursuant to Maryland Rule 2–501, "[a] trial court may grant summary judgment when there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law." *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 413 Md. 309, 329, 992 A.2d 459, 471 (2010) (internal quotation marks omitted).

**26.** As noted earlier, the parties disagree on the precise number of petition signatures or pages containing the alleged defects. The State Board does not concede the accuracy of Whitley's calculations, but has stipulated that at least 5,000 signature pages fall into each category of

agreement rests solely on the validity of the State Board's certification decision as a matter of statutory interpretation.

The State Board's decision to certify the petition for referendum was made pursuant to its interpretation of Article XVI, Section 4 of the Maryland Constitution and §§ 6–203–04 of the Election Law Article and therefore presents "an issue of statutory construction and consequently one of law." *Montgomery Cnty. Volunteer Fire–Rescue Ass'n v. Montgomery Cnty. Bd. of Elections*, 418 Md. 463, 469, 15 A.3d 798, 801 (2011); *Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78, 81 (2004) ("When interpreting constitutional provisions, we generally employ the same rules of construction that are applicable to the construction of statutory language.").

 The primary goal of statutory construction is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision[.]" *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007). In so doing, we look first to the "normal, plain meaning of the language of the statute," read as a whole so that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory[.]' " *Doe*, 406 Md. at 712, 962 A.2d at 351 (quoting *Barbre*, 402 Md. at 172, 935 A.2d at 708). If the language of a statute is clear and unambiguous, we "need not look beyond the statute's provisions and our analysis ends." *Barbre*, 402 Md. at 173, 935 A.2d at 709. Where the language of the statute is ambiguous and may be subject to more than one interpretation, however, we look to the statute's legislative history, case law, purpose, structure, and overarching statutory scheme in aid of searching for the intention of the Legislature. *Doe*, 406 Md. at 712, 962 A.2d at 351.

---

disputed signatures. As a result, regardless of the precise number of allegedly defective signatures, there is no dispute that if either category of signatures is defective as a matter of law, there will not be a sufficient number of signatures to submit SB 1 to referendum.

A. *Certification of Electronically–Generated Petitions.*

Pursuant to § 6–203, a petition signer must:

(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided:

 (i) the signer's name as it was signed;

 (ii) the signer's address;

 (iii) the date of signing; and

 (iv) other information required by regulations adopted by the State Board.

Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–203(a). Regulations promulgated by the State Board further provide, in relevant part, that "[w]hen signing the signature page, each signer shall . . . [p]rovide the following information, to be printed or typed in the appropriate spaces: (A) Date of signing, (B) Signer's name as it was signed, and (C) Current residence address . . .". COMAR 33.06.03.06.

We concluded previously that the provisions of § 6–203 are mandatory, not discretionary. *Doe,* 406 Md. at 728, 962 A.2d at 360. Thus, in order for the State Board to validate and verify properly a signature, the petition signers must have complied with the requirements in § 6–203. Section 6–203(a)(2) states, in relevant part, that "[t]o sign a petition, an individual shall . . . include the [required identifying] information, printed or typed, in the spaces provided . . .". There is no dispute that the information required by the statutory provisions and accompanying regulations—specifically, the signer's name, address, and date of signing—appeared on the signature pages at issue. Rather, Whitley asserts that Intervenor's use of MDPetitions.com, which allows individuals to generate electronically signature pages, contravenes the requirement of § 6–203 and COMAR 33.06.03.06B(1) that the signer "include" or "provide" his identifying information, and defeats the purpose of § 6–203 by increasing the risk of voter fraud. Essentially, Whitley contends that the language of the

statute and regulation requires that the *signer* "include" his or her identifying information, and that any signature for which a third party entered the identifying information is invalid on its face. Thus, Whitley takes exception not only to those signatures for which the individual entered the information into MDPetitions.com on behalf of himself or herself, but also for those in which an individual entered information into MDPetitions.com on behalf of another registered voter residing at the same address.

Further, Whitley claims that the State Board expressed disapproval regarding computer-generated petitions because they are the functional equivalent of pre-printed "walking" petitions.[27] By not following the letter of the law, Whitley contends, the computer program renders meaningless the protections against voter fraud provided by § 6–203. *See Doe,* 406 Md. at 731, 962 A.2d at 368 (stating that the purpose of § 6–203(a) is to "provide additional means by which fraudulent or otherwise improper signatures . . . may be detected" (quoting *Barnes v. State ex rel. Pinkney,* 236 Md. 564, 571–72, 204 A.2d 787, 791 (1964))).

Conversely, the State Board and Intervenor argue that the use of an online petitioning program is entirely consistent with

---

**27.** The State Board provides a list of Frequently Asked Questions regarding the petitioning process on its website. In 2011, one of the questions listed read: "Can a petition sponsor pre-print signature pages with voters' names and address, so that if a voter agrees to sign the petition, the voters need only fill in his or her signature, date of birth, and date of signing?" The State Board answered this question "No." Whitley claims that computer-generated petitions "pre-print" voters' names and addresses. The State Board, however, characterizes the prohibition on pre-printed petitions as one against "walking lists," or voter registration lists that include all voters in an area in street number order. The Board states that pre-printing petitions as part of a "walking list" does not comply with the applicable law. By contrast, the Board characterizes the petitions at issue here as generated based on a "household list," which prints the voter's identifying information in response to prompts that are filled out by the signer or someone in the signer's household. Because MDPetitions.com prints a voter's identifying information only in response to interactive prompts, the State Board does not categorize electronically-generated petitions as "pre-printed."

the statutory language because neither the statute nor the regulations specify the individual or method by which such information must be included. The State Board distinguishes its disapproval of pre-printed petitions from those at issue in the instant case, contending that its prohibition is on "walking lists" of petitions, rather than the type of household list generated by MDPetitions.com. Respondents contend that, in seeking a requirement that the signer print or type personally his or her identifying information, Whitley attempts to add additional, "unduly burdensome" elements to the petitioning process. *See Fire–Rescue*, 418 Md. at 476 n. 14, 15 A.3d at 805 n. 14 (2011) (noting that this Court has determined that statutes defining the referendum petition process "are viable if not unduly burdensome on the constitutionally protected right to referendum").

The Circuit Court, in considering Whitley's argument, rejected the contention that the plain meaning of the words "include" and "provide" necessitate that the petition signer print or type personally his or her identifying information. The court stated that, "[w]hile it might well be the case that a process like the one implemented by Intervenor was not contemplated by the legislature when the statute was written," there is no legal support in either Subtitle 6 of the Election Law Article or the State Board's accompanying regulations from which to conclude that the process employed here violates the law. Consequently, the Circuit Court affirmed the State Board's decision to certify the signatures submitted via electronically-generated petition.

██ We conclude that the language of § 6–203(a) and CO-MAR 33.06.03.06(B) is unambiguous. Section 6–203(a)(2) requires the petition signer to "include" his or her identifying information together with his or her signature as provided in (a)(1). The plain meaning of the word "include" is "to take in or comprise as part of a whole." Merriam–Webster's Collegiate Dictionary 588 (10th ed.1999).[28] As applied to this context,

---

28. In applying the plain meaning rule, "it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning."

the identifying information set out in § 6–203(a)(2) should be considered a component of the completed signature page. The requirement that the individual signing the petition "include" the identifying information specified in § 6–203(a)(2) does not require, therefore, that the individual signer be the person who prints or types the required information onto the signature page. Rather, it requires that the completed petition page submitted by the individual incorporate the relevant information.

Similarly, we do not impute a requirement that an individual type or print personally information from the State Board's use of the word "provide," which means "to supply or make available." Merriam–Webster's Collegiate Dictionary 940 (10th ed.1999). Whitley asks us to find that there is a personal completion requirement on the basis simply of these two words. Because our role in interpreting a statute does not include reading language into a statute, we decline to find that an individual must print or type personally his or her identifying information in order to comply with § 6–203. *See Johnson v. Mayor & City Council of Balt.*, 387 Md. 1, 14, 874 A.2d 439, 447 (2005) ("We may not read language into a statute that is not there").

In construing a statute, we must keep in mind also the purpose of the provisions at issue. *Barbre*, 402 Md. at 172, 935 A.2d at 708 (noting that the Court's primary goal in statutory construction is to "discern the legislative purpose,

*Chow v. State*, 393 Md. 431, 445, 903 A.2d 388, 396 (2006). As we have noted previously, when attempting to ascertain legislative intent in choosing specific statutory or constitutional language at a given point in time, e.g., time of enactment of the relevant statute or constitutional provision, "resort to a dictionary, legal or otherwise, should logically include consultation of those editions (in addition to current editions) of dictionaries that were extant at the time of the pertinent legislative enactments." *Harvey v. Marshall*, 389 Md. 243, 260 n. 11, 884 A.2d 1171, 1181 n. 11 (2005). Therefore, our interpretation of the words of the Election Law Article shall include reference to a popular 1999 dictionary, published three years before the adoption of (and extant as of) the recodified Election Law Article, while our interpretation of the constitutional provisions include reference to a dictionary in common use at the time the Referendum Amendment was adopted in 1914.

the ends to be accomplished, or the evils to be remedied by a particular provision"). Interpreting the words "include" and "provide" to require affirmative action on the part of the individual does little to further the purpose of the requirements of § 6–203(a)(2). As we described in *Fire–Rescue,* the provisions of § 6–203 are designed to assist the State Board in the two-step validation and verification process in Subtitle 6 of the Election Law Article. 418 Md. at 478–80, 15 A.3d at 807–08. Specifically, while the purpose of the signature requirement of § 6–203(a)(1) is to "provide a personal attestation, as a signature is often used, to evidence support for the petition and to provide a unique identifier," the printed or typed information is used not only to validate the signature on the petition, but also to "verify the eligibility of the petition signer to support the petition," as required by § 6–207. *Id.* at 479–80, 15 A.3d at 807–08. Thus, the statutory requirement that the individual provide his name, address, and date of signing "pertain only to the *identification of the signer." Barnes,* 236 Md. at 571, 204 A.2d at 791 (emphasis added) (discussing the statutory predecessor to § 6–203, Md.Code (1964 Supp.), Art. 33, § 169).[29] Whether an individual prints or types personally the information on the signature page, uses a computer program, or has someone else write the information on his or her behalf does not impact the ability of the State Board to identify the signer. The individual still provides to the State Board the petitioning voter's identifying information to aid the Board in validating and verifying the signatures under § 6–203 and § 6–207.

Whitley contends that to read § 6–203 in this way is contrary to the Legislature's intent because it opens the door to voter fraud. While preventing voter fraud was indeed a concern of the General Assembly in enacting the provisions of

---

**29.** Article 33 § 169 stated: "In every petition (including an associated or related set of petitions) under the provisions of Article XVI of the State Constitution, there shall be appended to the signature of each signer his residence, the precinct or district wherein he is registered as a voter, and immediately below the signature of any such signer, there shall be either printed or typed, the name of such signer."

Subtitle 6, *see, e.g. Fire–Rescue,* 418 Md. at 473, 15 A.3d at 804 ("Plainly, the overarching goal of the entire Petition Subtitle is to ensure that only eligible voters sign petitions...."), Whitley fails to point to any actual or persuasive indicia that allowing electronically-generated petitions contradicts this purpose. Regardless of whether a voter completes a paper or an electronic petition, the information required to be included by statute is the same. Moreover, there is no evidence that completing electronically a petition makes voter registration information any more readily available to an individual intent on committing voter fraud. *See id.* at 492 n. 6, 15 A.3d at 815 n. 6 (Harrell, J., dissenting) (noting the common practice of using a telephone book directory to commit circulator and petition fraud).

Allowing a voter to complete a computer-generated petition prioritizes citizen convenience. *See* Md.Code (2002, 2010 Repl. Vol.), Election Law Article, § 1–201(5). Registered voters need not wait for a petition sponsor or circulator to find or stumble upon them, but may participate in the political process on their own initiative. Further, because the software confirms electronically that the information entered by a voter matches the information on the voter registration rolls, the process permits individuals to avoid many common errors, such as entering a nickname (instead of a full name), that result frequently in the invalidation of petition signatures. An individual for whom a household member enters the information onto MDPetitions.com has the opportunity to inspect and verify the accuracy of the information before submitting the petition to the election authority. Whitley provides no persuasive evidence, or even conjecture, that any of these advances in citizen convenience will result in increased fraud.

Moreover, this interpretation is supported by the legislative history of § 6–203 of the Election Law Article. *See Mayor & City Council of Balt. v. Chase,* 360 Md. 121, 131, 756 A.2d 987, 993 (2000) ("[E]ven when the language of a statute is free from ambiguity, in the interest of completeness we may ... explore the legislative history of the statute under review ... [T]he resort to legislative history is a confirmatory process; it

is not undertaken to contradict the plain meaning of the statute." (internal quotation marks and citations omitted)). The predecessor of § 6–203, Md.Code (1964 Supp.), Art. 33 § 207, *repealed by* 2002 Md. Laws ch. 291, § 3 stated:

There shall be appended to the signature of each signer his residence, his occupation, the precinct or district wherein he is registered as a voter, and his place of business, and immediately below the signature of any such signer, there shall be either printed or typed, the name of such signer.

Hence, by requiring only that the signer's identifying information "be appended," the predecessor of § 6–203 contained no requirement that the signer print or type personally the information.

In 1998, the General Assembly directed the formation of a Commission to revise and recodify Maryland's election law "to remove[ ] archaic provisions, resolve[ ] omissions and contradictions, and incorporate[ ] substantive, structural changes in the current law that the Commission considers necessary to meet the needs of modern election administration." 1996 Md. Laws. ch. 432, § 1. The revised Election Code effected no substantive changes to the verification procedure in the petitioning process. *See* Report of the Commission to Revise the Election Code 55 (1997) (listing the addition of a provision for the removal of signatures from a petition as the only substantive revision to § 6–203 of the Election Law Article). The legislative history confirms that the plain meaning of the statutory provisions does not include a requirement that the signer print or type personally the required information on the signature page. Had the Legislature intended to impose a requirement that the signer of the petition print or type personally his or her information directly onto a signature page, it would have done so presumably. *Compare* Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–203(a)(2) *with* Md.Code (1957, 1971 Repl.Vol.), Article 33, § 23–2, *superseded by statute* (stating that signers of a "petition for the election of a charter board . . . shall place to the right of his or her name as and when signed, the date of such signature *in his or her own handwriting* " (emphasis added)). Conse-

quently, we decline to read § 6–203 and COMAR 33.06.03.06 to include a requirement that the signer of a petition print or type personally his or her identifying information on a petition.

### B. *Sufficiency of Circulator Affidavit.*

■■■ We turn now to whether a self-circulated petition, in which both the affidavit and petition are signed by the same individual, violates Md. Const. art. XVI, § 4 or the Election Law Article. Article XVI, § 4 of the Maryland Constitution requires that "there shall be attached to each paper of signatures filed with a petition an affidavit of the person procuring those signatures that the signatures were affixed in his presence and that, based upon the person's best knowledge and belief, every signature on the paper is genuine and bona fide and that the signers are registered voters at the address set opposite or below their names." The Maryland General Assembly provided further that "[e]ach signature page shall contain an affidavit made and executed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed." Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–204(a).

Whitley contends that both the Maryland Constitution and the Election Law Article require that an individual other than the petition signer prepare and sign the circulator's affidavit. Specifically, Whitley argues that the use of the words "procure," "presence," and "obtain" imply that more than one person was intended to be present at the time the signatures are affixed to the signature page and that, accordingly, an independent witness is required to sign the circulator's affidavit. Allowing a signer to self-circulate a petition by signing both as the signer and the circulator, Whitley claims, defeats the purpose of the affidavit requirement and increases the risk of voter fraud by removing an element of the validation and verification process. Whitley asks this Court to invalidate the signatures submitted by individuals who signed a petition as both the signer and the circulator.

By contrast, the State Board and Intervenor argue that the State Board certified properly the self-circulated signature pages because neither the Constitution nor the Election Law Article specifies the individual required to serve as circulator. Because there is no express requirement that a person other than the signer of the petition serve as a circulator, Respondents assert that the language of the statute permitted clearly and unambiguously the State Board to certify the signatures at issue. Although Respondents contend that the constitutional and statutory provisions are unambiguous, the State Board maintains that even if we were to find otherwise, we should extend deference to the State Board's interpretation that self-circulation of a petition is consistent with the applicable law. Further, Respondents urge that allowing an individual to sign his or her own petition as circulator decreases, rather than increases, the risk of voter fraud because the circulator must sign the affidavit under penalty of perjury. As a result, Respondents argue, the individual is subject not only to the criminal penalties imposed by Subtitle 6 of the Election Law Article, but also the threat of a perjury charge and possible conviction.

In granting the State Board's motion for summary judgment, the Circuit Court judge determined that the language at issue was unambiguous and declined to require that a person other than the signer of the petition serve as the circulator. The court noted that, although neither the Constitution nor the Election Law Article contain an express requirement regarding the identity of the circulator, the General Assembly had the option to impose such a requirement. Therefore, because the "legislature determined that the provisions of Subtitle 6 of the Election law Article would best serve the interests of preventing fraud," the trial court affirmed the State Board's application of the law.

We agree with the decision of the Circuit Court and conclude that Article XVI, Section 4 and Election Law § 6–204 contain no ambiguity regarding the identity of the circulator. Therefore, we need not pin our reasoning on deference to the State Board's interpretation. *See Fire–Rescue*, 418 Md. at

469, 15 A.3d at 801 ("[W]e conclude that the particular statutory provision at issue . . . is clear and unambiguous, notwithstanding the utility of judicial gloss, and therefore we do not defer to the Board's interpretation."); *Aviation Admin. v. Noland,* 386 Md. 556, 572, 873 A.2d 1145, 1155 (2005) ("When a statutory provision is entirely clear, with no ambiguity whatsoever, administrative constructions, no matter how well entrenched, are not given weight." (internal quotation marks and citations omitted)). While it may be accurate to observe that the Legislature provided for the possibility of two distinct classes of individuals, it did not require expressly that the signer and circulator be different persons. There is no support for Whitley's contention that allowing self-circulated petitions runs contrary to the purpose of the circulator's affidavit. Rather, because the Election Law Article imposes independent penalties on individuals who commit voter fraud that are designed to shield the referendum process from consideration of petitions with insufficient signatures, we decline to adopt Whitley's hypertextual view of Article XVI, Section 4 and § 6–204 of the Election Law Article.

We consider the constitutional and statutory provisions at issue in light of the purpose of the circulator's affidavit. As we stated previously, the circulator's affidavit assists in validation of the petition signatures by attesting to the genuine nature of an individual's signature and status as a registered voter. *See Fire–Rescue,* 418 Md. at 478–80, 15 A.3d at 807–08. "The purpose of the circulator's attestation is to 'assure the validity of the signatures and the fairness of the petition process,' " *id.* (quoting Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–204(b)), prevent fraud in the petition process, and provide an additional guarantee of trustworthiness to the signature of the voter. *Id.* at 479, 15 A.3d 798. The language of the Constitution and the Election Law Article is consistent with this purpose. By requiring that the affidavit attest to the authenticity of the signature and the accuracy of the information required to be submitted by law, the affidavit is an independent check on the validity of the petition signatures.

In accordance with this overarching purpose, we consider the meaning of the specific provisions at issue. Article XVI, Section 4 prescribes "only the form and contents of the affidavit to be signed by the person procuring the signatures," *Howard Cnty. Citizens for Open Gov't v. Howard Cnty. Bd. of Elections*, 201 Md.App. 605, 625, 30 A.3d 245, 258–59 (2011), while the General Assembly is authorized to establish procedures to determine the authenticity of the affidavit. Md. Const. art. XVI, § 4. Although Whitley argues that Section 4 and the Election Law Article also specify the identity of the individual required to fill out the affidavit, the constitutional and statutory language contain no such specification. Indeed, the Election Law Article does not refer to the identity of the circulator, instead defining the circulator as "an individual who attests to one or more signatures affixed to a petition," Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–101(d), limited only by the requirement that the circulator be at least eighteen years of age at the time the signatures are affixed to the petition. Election Law Article, § 6–204(c). In addition to his or her signature, the circulator must provide his or her printed or typed name, address, and telephone number to aid in the validation process. COMAR 33.06.03.07. Thus, it appears that the purpose of the affidavit is to confirm that the signature of the individual appearing on the petition in fact belongs to the person that it purports to represent.

Additionally, the General Assembly promulgated penalties designed to safeguard the integrity of the petitioning process. Most importantly, an individual who executes a fraudulent circulator's affidavit is subject to the threat of a perjury prosecution. *See* Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–101(b) (" 'Affidavit' means a statement executed under penalty of perjury."); Md.Code (2002, 2012 Repl. Vol.), Criminal Law Article, § 9–101(b) ("A person who [commits perjury] is guilty of [a] misdemeanor ... and on conviction is subject to imprisonment not exceeding ten years."). Further, the Election Law Article provides a broad punitive scheme for individuals who attempt to commit fraud in the petitioning process, including criminal penalties for any indi-

vidual who willfully and knowingly "sign[s] the name of any other person to a petition," "falsif[ies] any signature or purported signature to a petition," or "circulate[s], cause[s] to be circulated, or file[s] with an election authority a petition that contains any false, forged, or fictitious signatures." Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 16–401. Although Whitley contends that requiring an independent signer and circulator is necessary to ensure the integrity of the petitioning process and deter fraud, he provides no persuasive evidence that the provisions adopted by the General Assembly are insufficient to accomplish that objective.

Whitley asks us to engage in a hypertextual analysis in which we parse the terms "procure," "observe," and "presence" to imply a requirement that it takes two to tango in the completion of each signature page. This suggested approach leads us nonetheless to the conclusion that a self-circulated petition is valid. The term "procure" means commonly "to get or obtain; cause" or "to get possession of." New Websterian 1912 Dictionary 651 (1912) ("to get or obtain; cause"); Merriam–Webster's Collegiate Dictionary 930 (10th ed.1999) ("to get possession of; obtain by particular care and effort"). Although one could employ the term "procure" to demand the presence of more than one individual, neither the language of the constitutional provisions nor the common definition imply that the participation of two distinct individuals is necessary. Likewise, "observe" means commonly "to watch carefully . . ." or "to take notice." Merriam–Webster's Collegiate Dictionary 802 (10th ed.1999). The Election Law Article requires the circulator's affidavit to be executed by the individual "who observed each of [the petition] signatures being affixed." Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–204(a). Although the General Assembly could have imposed (and may yet include) an express requirement that the circulator be independent from the signer, it instead defined more forgivingly the circulator as "an individual who attests to one or more signatures affixed to the petition." Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–101(d). We find it instructive that the General Assembly declined to impose an

express requirement regarding the identity of the circulator in favor of a broader, expansive definition. Therefore, we determine that, within the context of the Election Law Article, the use of the word "observe" does not require that the signer and circulator be distinct individuals.

Nor does the requirement that the circulator's affidavit attest that the petition signatures were affixed "in his presence" mandate the participation of two individuals. *See* Md. Const. art. XVI, § 4 (requiring an attestation that the petition signatures were "affixed in his presence"); Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–204(a) (requiring the affidavit to be executed "by the individual in whose presence all of the signatures on that page were affixed"). At the adoption of Article XVI, Section 4, "presence" was defined commonly as "the state or quality of being present." [30] New Websterian 1912 Dictionary 645 (1912); *see also* Merriam–Webster's Collegiate Dictionary 921 (10th ed.1999) (defining "presence" as "the fact or condition of being present"). We cannot impute exclusively from the use of the term "presence" a requirement that the signer and circulator be different individuals. To the contrary, an individual is necessarily and metaphysically in his or her own presence, and thus may attest to his or her own signature being affixed to a petition signature page "in his presence," without violating the requirements of Section 4 or the Election Law Article.

As support for his contrary contention, Whitley references the Estates & Trust Article's requirement that a will must be "signed by two or more credible witnesses in the presence of the testator." Md.Code (1974, 2011 Repl.Vol.), Estates & Trusts Article, § 4–102. This attempted analogy is unpersuasive for two reasons. First, the signature requirement in the context of wills is necessary to provide presumptive evidence of its validity because the testator necessarily is deceased and

---

**30.** To be "present" was further defined as "being in a certain place; at hand or in sight." New Websterian 1912 Dictionary 645 (1912). In 2002, when the revised Election Code was adopted, "present" meant commonly "being in view or at hand." Merriam–Webster's Collegiate Dictionary 921 (10th ed.1999).

unavailable to testify as to his or her recollection. *Van Meter v. Van Meter*, 183 Md. 614, 618, 39 A.2d 752, 754 (1944). Second, although the underlying purpose of the signature requirement in both the wills and voter petition contexts is the prevention of fraud, *see Slack v. Truitt*, 368 Md. 2, 12–13, 791 A.2d 129, 135 (2002) (noting that the presence of the signatures on a will creates a presumption of validity); Md.Code (2002, 2010 Repl.Vol.), Election Law Article, § 6–204(b), there is an additional safeguard present in the referendum context. Specifically, the requirement that the circulator's affidavit be signed under penalty of perjury, thereby subjecting the circulator to criminal penalties, provides an additional guarantee of trustworthiness that is not present in the Estates and Trusts context.

We determine that the provisions of the Maryland Constitution and the Election Law Article are unambiguous. They do not specify the identity of the circulator, and certainly contain no requirement that the circulator and signer be separate individuals. The statutory provisions already in place are adequate to meet its uncontroverted purpose of preventing voter fraud. Whitley provides no persuasive evidence or conjecture to the contrary. Indeed, Whitley does not contend that voter fraud occurred in the instant case. Therefore, we determine that self-circulating petitions are consistent with both the letter and the spirit of the applicable constitutional and statutory provisions.

BATTAGLIA, ADKINS and BARBERA, JJ., dissent.

ADKINS, J., dissenting.

I cannot endorse the Majority's disregard for our plain-meaning rule of statutory construction,[1] and its conclusion that the signer and circulator of a referendum petition can be the same individual. When engaging in statutory interpretation, this Court's "paramount objective [is] to ascertain and give

---

1. As Justice Scalia explains: "Courts have sometimes ignored plain meaning in astonishing ways." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 72 (2012).

effect to the intent of the legislature." *General Motors Corp. v. Schmitz*, 362 Md. 229, 236, 764 A.2d 838, 842 (2001). This "quest ... begins with the text of the statute." *Huffman v. State*, 356 Md. 622, 628, 741 A.2d 1088, 1091 (1999). We examine the text and apply its plain meaning, using "a common sense perspective" of how the statutory language is commonly understood. *Id.*

### The Plain Meaning of the Text

The Maryland Constitution provides that "There shall be attached to each paper of signatures filed with a petition an affidavit of **the person procuring** those signatures that the signatures were **affixed in his presence** . . . ." Md. Const. art. XVI, § 4 (emphasis added). The Election Law Article states that "Each signature page shall contain an affidavit made and executed by the individual **in whose presence** all of the signatures on that page were affixed and **who observed** each of those signatures being affixed." Md.Code (2002, 2010 Repl.Vol.), § 6–204 of the Election Law Article (emphasis added). The Code of Maryland Regulations ("COMAR") developed by the Board of Elections requires that "[t]he affidavit shall state that ... [t]he **circulator personally observed each signer** as the page was signed." COMAR 33.06.03.08 (emphasis added).

These provisions of Maryland law clearly direct a circulator to procure the required number of signatures for referendum and then attest that she personally observed those signatures being affixed in her presence. Reading these provisions would lead any ordinary person to understand that their obvious and plain meaning contemplates the involvement of two different people: a circulator and a signer. The circulator goes out and **procures** the required number of signatures from registered voters and then attests that he personally **observed** these signers affix their signatures in the circulator's **presence**.

With a disdainful eye, the Majority calls this plain meaning interpretation of the law "hypertextual." Maj. Op. at 158–59, 161, 55 A.3d at 53, 54–55. What the Majority ignores, however, is that this supposed "hypertextual" reading is exactly what

this Court is required to do when interpreting a statute. This Court must read the relevant constitutional and statutory provisions and apply their plain meaning. *See Huffman,* 356 Md. at 628, 741 A.2d at 1091. Making up a disdainful term, like "hypertextual," [2] does not justify a departure from the well-settled plain meaning rule.

Ignoring the plain meaning of the constitutional and statutory provisions, the Majority stretches the statute to include matters not clearly within its provisions. *See State v. Christhilf,* 170 Md. 586, 592, 185 A. 456, 458 (1936) ("[I]t is not the duty or province of a court so to stretch the provisions of a statute as to ... gather in objects not contemplated by the legislature or not clearly falling within its provisions."). The Majority holds that the provisions permit self-circulation because the language "did not require expressly that the signer and circulator be different persons." Maj. Op. at 159, 55 A.3d at 53. This reasoning, however, imports into the relevant provisions something that is not there. It takes the absence of an explicit distinction between circulator and signer and draws from it an inference of an affirmative right to self-circulate referendum petitions. The Majority is wrong to draw this inference from the statute and allow it to prevail over the plain meaning of the text. *See Gorman v. Atlantic Gulf & Pacific Co.,* 178 Md. 71, 75, 12 A.2d 525, 527 (1940) ("[T]he court may not allow an inference to prevail against the manifest intention of the Legislature."). Such a holding abandons this Court's "paramount objective to ascertain and give effect to the intent of the legislature ... [by looking] first to the plain language of the statute." *Schmitz,* 362 Md. at 236–37, 764 A.2d at 842 (citation omitted).

### The Purpose of the Text

Article XVI, § 6–204, and COMAR 33.06.03.08 obviously contemplate the involvement of two distinct individuals—a

---

**2.** A search of the American Heritage Dictionary of the English Language (4th ed.2006) and Webster's Third New International Dictionary Unabridged (Philip Babcock Grove ed., 2002) reveals that neither source contains the word "hypertextual."

circulator and a signer. With this clear and unambiguous language, our inquiry would ordinarily end. *See Brown v. State,* 359 Md. 180, 188, 753 A.2d 84, 88 (2000). We may, however, go on to consider the text in light of the purpose of the statute being interpreted. Specifically, the plain meaning should be construed "as to carry out and effectuate, or aid in, the general purposes and policies" of the statute being interpreted. *Johnson v. State,* 75 Md.App. 621, 630, 542 A.2d 429, 433 (1988).

The purpose of § 6–204 of the Election Law Article, and the requirement of the circulator's affidavit contained therein, "is to assure the validity of the signatures" and "clearly addresses prevention of fraud." *Montgomery County Volunteer Fire–Rescue Ass'n v. Montgomery County Bd. of Elections,* 418 Md. 463, 478–79, 15 A.3d 798, 807 (2010). Likewise, interpreting the requirement of the circulator's affidavit contained in Article XVI, § 4 of the Maryland Constitution, this Court has stated: "The purpose of the requirement of the affidavit is to give a prima facie presumption of validity to the petition to which it is attached." *Tyler v. Secretary of State,* 229 Md. 397, 404, 184 A.2d 101, 104 (1962). Therefore, the purpose of the circulator's affidavit is two-fold. It is designed to prevent fraud in the first place, and second, if executed correctly, the affidavit creates a presumption that there is no fraud.

This two-fold purpose of the circulator affidavit supports the plain meaning interpretation that there must be two different individuals—a circulator and a signer. Interpreting the statute to require separate circulators and signers directly carries out, effectuates, and aids the "uncontroverted purpose of preventing voter fraud." Maj. Op. at 163, 55 A.3d at 56. The existence of the separate circulator provides an independent check on the signer. The circulator is able to vouch that the signer did in fact appear before the circulator and did in fact sign the petition. Thus, the independent circulator prevents an individual from affixing multiple signatures to the petition, as each signer must personally appear in front of the circulator before her signature can be affixed to the petition.

The Majority does not deny that this plain meaning interpretation furthers the prevention of fraud. Instead, it says that it is not necessary to interpret the relevant provisions to further the purpose of § 6–204 because "the Election Law Article imposes independent penalties on individuals who commit voter fraud that are designed to shield the referendum process from consideration of petitions with insufficient signatures." Maj. Op. at 159, 55 A.3d at 53. Specifically, the Majority reasons that the signer of the affidavit "is subject to the threat of a perjury prosecution" and "the Election Law Article provides a broad punitive scheme for individuals who" commit voter fraud. Maj. Op. at 160–61, 55 A.3d at 54. Thus, the Majority holds that it is not necessary to have separate circulators and signers because these other provisions are sufficient to protect against fraud. Maj. Op. at 160–61, 55 A.3d at 54–55.

The Majority misses the mark. It is irrelevant whether the Election Law Article has additional safeguards built in that are also designed to prevent fraud. It is the duty of this Court to interpret every provision of the statute in light of its purpose. This Court cannot pick and choose among statutory provisions and decide that the threat of a perjury conviction is a better means of preventing voter fraud than requiring the circulator and signer to be different people. The Legislature provided for both provisions, and as such, both provisions must be interpreted as a means of preventing fraud. Allowing for self-circulation does nothing to carry out, effectuate, or aid the general purpose of the statute to prevent fraud. The correct interpretation, therefore, is one that requires different circulators and signers. This gives affect to the plain meaning of § 6–204 while also furthering its purpose of preventing fraud.[3]

---

3. The Majority's rationale against interpreting § 6–204 to further the purpose of preventing fraud is further cast into doubt by its complete failure to consider the second half of the purpose of the circulator's affidavit—the creation of a presumption of validity. Even if one were to accept that the threat of a perjury prosecution was sufficient to ignore our mandate to interpret every provision to carry out and

### The Plain Meaning of "Procure," "Observe," and "Presence"

In one final attempt to justify its holding, the Majority says that it would reach the same conclusion even if it decided to engage in this "hypertextual" interpretation of the statute. Maj. Op. at 161, 55 A.3d at 54–55. It quotes dictionary definitions for the terms "procure," "observe," and "presence," and reasons that none of these definitions strictly demand the existence of two individuals. Maj. Op. at 161–63, 55 A.3d at 54–56. The Majority concludes, therefore, that the circulator and signer may be the same person because neither the Constitution nor the statute says otherwise.

The inferences that the Majority draws from these dictionary definitions, however, do not comport with the commonly understood meanings of these terms. *See Morris v. Prince George's County,* 319 Md. 597, 606, 573 A.2d 1346, 1350 (1990) ("To determine the most appropriate [meaning of a word] in given circumstances requires more than a glance at a dictionary. It requires careful study of the context in which the word is used."). Under the Majority's definitions, the Legislature would have intended for a circulator to procure his own signature from himself; observe himself writing his own signature; and affix his signature in his own presence. This formulation is simply not logical. No one speaks in the manner in which the Majority now attempts to define these terms. No one says that they "procure" something from themself. No one says that they "observe" themself perform an act. No one says that they are "metaphysically in his or her own presence." Maj. Op. at 162, 55 A.3d at 55. The definitions used by the Majority are not the commonly understood meanings of these words. We should examine the words "procure," "observe," and "presence" in context.

---

effectuate its purpose, the Majority fails to consider that there is no separate provision that creates a presumption of validity.

*Procure*

First, the Majority defines "procure" as "to get or obtain" or "to get possession of." Maj. Op. at 161, 55 A.3d at 54–55. Contrary to the Majority's interpretation, the common meaning of this definition involves two individuals. One does not "get or obtain" something from herself. She gets or obtains something from someone else. Applying this common understanding of the word procure in this context, a person does not get or obtain her own signature. She procures, or gets or obtains, the signatures of others.

Understanding the term "procure" as requiring two individuals in this context is supported by this Court's previous description of a circulator: "It is established ... that the one procuring the petitions or circulating them is the agent of the signers...." *Tyler,* 229 Md. at 403, 184 A.2d at 104. Implicit in this Court's previous statement is that "the one procuring the petitions" is different from "the signers" of the petitions. The circulator procuring the petitions is acting as the agent for the individuals signing the petition. One does not act as an agent for herself. If she were, then she would be the principal, not the agent. An agent acts for someone else. There are two individuals: the principal and the agent. Just as in this case, there are two individuals: the circulator acting as the agent, who procures the signatures, and the signers, who are the principals.

*Observe*

Second, the Majority defines "observe" to mean "watch carefully" or "to take notice." Maj. Op. at 161, 55 A.3d at 54–55. Yet, dictionaries in defining this word use examples such as: to "observe a child's behavior," American Heritage Dictionary of the English Language 1213 (4th ed.2006) (emphasis removed); "I have observed my own children carefully," Webster's Third New International Dictionary Unabridged 1558 (Philip Babcock Grove ed., 2002) (emphasis removed); "He observed the passerby in the street," "I wanted you to observe her reaction to the judge's question," and "He observed frequently that clerks were not as courteous as they used to be,"

The Random House Dictionary of the English Language 1338 (Stuart Berg Flexuer ed., 2d ed.1987) (emphasis removed). None of these examples portray a person watching himself carefully. They portray a person watching someone else carefully. Applying this common understanding of the word observe in the context of these laws, a person does not observe himself affix his own signature. He observes, or watches carefully, someone else affix their signature.

Evidently, the Majority ignores this common understanding believing that the Legislature intended for the circulator to engage in some form of "self-observation." I submit that nowhere in the law has the word "observe" been used to mean watching oneself perform some act. Further, the Majority does not offer anywhere in the law where the word "observe" means anything different than the common definitions I provide above.[4]

### Presence

Third, the Majority defines "presence" as "the state or quality of being present." Maj. Op. at 162, 55 A.3d at 55. It uses this definition to mean that one is in her own presence when she signs the circulator affidavit. It is well established, however, that this Court must construe a statute "so that no word, clause, sentence or phrase is rendered superfluous or nugatory." *Chow v. State*, 393 Md. 431, 443, 903 A.2d 388, 395 (2006) (citations and quotation marks omitted). Allowing an individual to sign his own affidavit reads the circulator re-

---

4. To be sure, there have been writings that have explored the psychological experiment of self observation. Perhaps the Majority has read The Fourth Way and Esoteric Christianity: An Introduction to the Teachings of G.I. Gurdjieff where the author submits that self observation requires a person to divide her attention because there is a difference between "seeing a tree, and seeing yourself seeing a tree." Rebecca Nottingham, The Fourth Way and Esoteric Christianity: An Introduction to the Teachings of G.I. Gurdjieff 35 (2009). Under this form of self-observation, the field of psychology requires a person to create a "new vantage point in addition to [her] normal awareness" in order to actually observe herself. This form of self-observation is not within the common understanding of the term observe that I have described above.

quirement out of the statute. There is no longer a need for a person to circulate referendum petitions and procure signatures because now each individual can simply sign the petition and the affidavit. *Cf. Montgomery County Volunteer Fire-Rescue Ass'n*, 418 Md. at 484, 15 A.3d at 810 (Harrell, J., dissenting) (arguing that "the Majority opinion has read the signature requirement out of the [Election law] statute").

To the contrary, dictionaries defining the term explain that a person is present by "[b]eing at hand or in attendance: Thirty guests were present at the ceremony." American Heritage Dictionary of the English Language 1388 (emphasis removed). This makes clear that a person is not present in herself. She is present in relation to someone else. As such, applying this common understanding of the word presence in this context, a person is not in her own presence when signing the petition. She is in the presence of someone else signing the petition.

Requiring a second individual in the context of referendum petitions is supported by the common understanding of the term "presence" that this Court has used in other contexts. For example, the Estates and Trusts Article requires that a will should be "attested and signed by two or more credible witnesses in the presence of the testator." Md.Code (2001, 2011 Repl.Vol.), § 4–102 of the Estates and Trusts Article. Just like the requirement of the circulator's affidavit in this case, the purpose of attesting to the will in the presence of the testator is to prevent fraud and create a presumption of a valid will. *Slack v. Truitt*, 368 Md. 2, 12–13, 17, 791 A.2d 129, 135, 138 (2002). In such cases, this Court has always understood that the witnesses and the testator must be different people, notwithstanding the fact that there is no such express distinction in the Estates and Trusts Article. The witnesses must sign in the presence of the testator and a testator cannot witness his own will.[5]

---

**5.** The Majority's rejection of this analogy is mistaken. First, the Majority says that it is unpersuaded by this analogy because the purpose of the signature requirement for a will is to provide a presumption of validity.

Additionally, Maryland Rule 15–202 defines "direct contempt" as "a contempt committed in the presence of the judge presiding in court." Md. Rule 15–202(b). In this context, this Court has always understood that the phrase "in the presence of the judge" requires two individuals: the judge, in whose presence the contempt is committed, and a second individual who commits the contempt. Likewise, Maryland law allows a police officer to make an arrest without a warrant for "[c]rimes committed in [the] presence of [the] police officer." Md.Code (2001, 2008 Repl.Vol.), § 2–202 of the Criminal Procedure Article. In this context, this Court has also always understood there to be two different individuals: the police officer, in whose presence the crime is committed, and a second individual, who commits the crime.

The legislative language in these three examples is very similar if not identical to that found in the Election Law Article. In the current case, the circulator must attest that "the signatures were affixed in his presence." Md. Const. art. XVI, § 4. Similarly, the witnesses must sign the will "in the presence of the testator," the contempt must be "committed in the presence of the judge" and the crime must be "committed in [the] presence of [the] police officer." In all four cases the

Maj. Op. at 162–63, 55 A.3d at 55–56. The Majority completely misses, however, that the purpose of the circulator's affidavit is also to provide a presumption of validity. *Tyler v. Secretary of State*, 229 Md. 397, 404, 184 A.2d 101, 104 (1962). As such, the fact that both the signature of the witness and the circulator's affidavit serve the exact same purpose makes this analogy more persuasive, not less.

Second, the Majority argues that this analogy is unpersuasive because the Election Law Article contains additional safeguards against fraud, whereas the Estates and Trusts Article does not. Maj. Op. at 162–63, 55 A.3d at 55–56. As previously explained, this argument completely misses the mark. The existence of additional safeguards in the Election Law Article is completely irrelevant to this case. The Legislature felt it necessary to provide for multiple provisions to aid in the prevention of fraud. This Court cannot choose which provisions it likes the best or which provisions it believes would be most effective in preventing fraud. Indeed, it may have been wise for the Legislature to provide multiple safeguards to prevent fraud since no one method is perfect. As such, it is improper for the Majority to disregard the purpose of the circulator's affidavit to prevent fraud merely because the threat of a

legislative language is nearly identical and the common understanding of all four provisions leads to the same conclusion—that the term presence contemplates the existence of two different individuals. The Majority cites no instances, and I find none in which the statutory term "in the presence of" has been judicially determined to refer to only one person.

The Majority is left with only a metaphysical notion, saying that "an individual is necessarily and metaphysically in his or her own presence." Maj. Op. at 162, 55 A.3d at 55. Under the Majority's view, each and every circulator would be a modern day Aristotle, continuously pondering his very own existence in the world.[6]

I submit that the Legislature did not write these words with the intent of requiring this Court to resort to such a metaphysical interpretation. We have a duty to apply the plain meaning of the language under a common sense perspective in terms that the language is commonly understood. *See Huffman,* 356 Md. at 628, 741 A.2d at 1091. The use of the term "presence" in the Election Law Article is better defined using its commonly understood meaning which involves two distinct people—the circulator and the petition signer.

## Conclusion

I would hold, therefore, that Article XVI, § 4 of the Maryland Constitution, § 6–204 of the Election Law Article, and COMAR 33.06.03.08 do not permit the self-circulation of referendum petitions. The plain meaning of these provisions, interpreted in light of furthering the purpose of preventing fraud, contemplates the separate existence of both a circulator and a signer. The same individual cannot fulfill both requirements under the current constitutional and statutory law. I

---

perjury conviction also exists. *See* Maj. Op. at 162–63, 55 A.3d at 55–56.

**6.** As Aristotle once explained, "whenever we perceive, we are conscious that we perceive, and whenever we think, we are conscious that we think, and to be conscious that we are perceiving or thinking is to be conscious that we exist." Aristotle: Nicomachean Ethics 563 (Harris Rackham trans., 1934). This idea was later explored in greater detail by Descartes, who famously asserted: "I think, therefore I am."

would hold that the petition is legally insufficient for lack of the required number of valid signatures.

Judges BATTAGLIA and BARBERA authorize me to state that they agree with the views set forth herein.