63 A.3d 582

**Constantine KOSTE**

v.

**TOWN OF OXFORD, et al.**

**No. 42, Sept. Term, 2012.**

Court of Appeals of Maryland.

March 26, 2013.

Michael G. Rust, (Armistead, Griswold, Lee & Rust, P.A., Easton, MD), on brief, for Petitioner.

Brynja M. Booth, (David R. Thompson of Cowdrey Thompson, P.C., Easton, MD), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

HARRELL, J.

This case presents the novel question of whether a petition seeking to bring a municipal annexation resolution to referendum may be circulated and signed by members of the relevant electorate before final enactment of the targeted resolution. Depending on the answer to that question, there may lurk an additional related query: may the petition be circulated before the commencement of the public hearing on the resolution?

Our story begins with the legislative body of the Town of Oxford, Maryland ("Oxford"), introducing a resolution that proposes to annex a sizable number of acres of submerged lands adjacent to the Town's boundaries. Following first publication in a local newspaper of a legal notice of the pendency of the resolution and of the date and time of a public hearing, as required by the governing annexation statute,[1] petition circulators among the voters of Oxford prepared and began circulating promptly a petition for referendum regarding the proposed resolution. Three days before expiration of the statutory deadline to submit the referendum petition to the Town fathers following adoption of the resolution, the circulators submitted the petition containing enough signatures for a referendum.[2] In achieving the required number of signatures, the petition contained a number of signatures that were affixed patently before the public hearing on the annexation resolution was held and others after that event, but before the final enactment of the resolution.[3] If the signatures affixed prior to enactment of the resolution were deemed

---

**1.** The annexation process is governed by Maryland Code, Article 23A, § 19 ("Article 23A, § 19").

**2.** Article 23A, § 19(g) provides that within forty-five (45) days following the final enactment of an annexation resolution, the submission of a petition containing at least twenty (20%) percent of the municipality's qualified voters' signatures shall cause the resolution to be submitted to a referendum.

**3.** In the present case, no substantive revision of the content of the resolution occurred between the time of introduction of the resolution

invalid, the petition would not have sufficient signatures to place the resolution on the ballot. The Commissioners of the Town of Oxford (the "Commissioners") determined that a referendum was not required because the signatures affixed before final enactment of the resolution were invalid.

Petitioner Constantine Koste ("Koste"),[4] a resident and registered voter of Oxford, filed in the Circuit Court for Talbot County a Complaint for Declaratory Judgment and a Writ of Mandamus contending that referendum petition signatures may be obtained lawfully before final enactment of an annexation resolution and, thus, the referendum petition was valid. Koste filed also a Motion for Summary Judgment. The Circuit Court granted summary judgment in favor of Koste, holding, as a matter of law, that signatures on a referendum petition may be collected before final enactment of the targeted annexation resolution. Oxford appealed to the Court of Special Appeals, which, in a reported opinion, reversed the Circuit Court's judgment, holding that the referendum petition was insufficient because signatures on a referendum petition may be obtained only after final enactment of the annexation resolution. *Town of Oxford v. Koste*, 204 Md.App. 578, 593, 42 A.3d 637, 646 (2012). Koste filed timely a petition for writ of certiorari to this Court. We granted the petition to consider the following question:

> Are signatures valid on a petition for referendum under Md.Code Ann. Article 23A, § 19(g) where the signatures

---

and its final adoption. Although this fact raises the specter of a "no harm, no foul" factor in the consideration of this case, we decline to base our analysis on such ground. The serious statutory interpretation question presented here regarding the operation of a representative form of local government, pursuant to the annexation statute, and the retained, but limited, concept of the electorate's direct role in a participatory democracy, deserves an answer.

4. During this litigation, it appears that Petitioner Constantine Koste became disabled as a result of illness and was incompetent to continue as a party to this action. Pursuant to Maryland Rules 6–401 and 2–241, a Notice of Substitution was filed on 10 September 2012 substituting Gugy A. Irving, III, a resident and registered voter of Oxford who signed the petition at issue in this case, as Petitioner. For clarity, we shall refer in this opinion nonetheless to Petitioner as Koste.

were obtained after the publication of notice of the annexation resolution, the resolution was finally enacted without modification and the petition was presented to and filed with the chief executive and administrative officers of the town within 45 days after final enactment?

*Koste v. Town of Oxford,* 427 Md. 606, 50 A.3d 606 (2012).

For reasons to be explained, we answer the question in the negative and affirm the judgment of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

On 14 July 2009, the Commissioners introduced Resolution 1001 (the "Resolution"), which purported to annex 142 acres of submerged lands under public waters adjacent to the then municipal boundary of Oxford. The object of the proposed annexation was to establish Oxford's jurisdiction over these adjacent lands and waters of the Tred Avon River in order to regulate, along with the Maryland Department of the Environment, the placement of wharves, piers, mooring piles, mooring buoys, floating docks, and associated structures.

The Commissioners, as required by Article 23 A, § 19(d),[5] published public notice of the pendency of the Resolution (the "Notice") in a newspaper of general circulation in Oxford, *The Star Democrat,* for four consecutive weeks, beginning on 10

---

5. Article 23A, § 19(d) provides:

(d) Notice and hearing.—After the introduction of the resolution into the legislative body of the municipal corporation, the chief executive and administrative officer of the municipal corporation shall cause a public notice thereof to be published not fewer than four times or, if the total area of the proposed annexation is for 25 acres of land or less, not fewer than two times, at not less than weekly intervals in a newspaper or newspapers of general circulation in the municipal corporation and the area to be annexed, briefly and accurately describing the proposed change and the conditions and circumstances applicable. The public notices shall specify a time and place at which a public hearing will be held by the legislative body on the resolution; the hearing shall be set for not less than 15 days after the fourth publication of the notices or, if the total area of the proposed annexation is for 25 acres of land or less, not less than 15 days after

August 2009. The Notice (1) provided an overview of the Resolution; (2) stated that the Commissioners would be conducting a public hearing on the Resolution on 22 September 2009 at 8:00 p.m.; and (3) stated that "copies of the resolution and exhibits" as well as "[t]he technical legal description of the land proposed for annexation, together with a plat depicting the area to be annexed, and the proposed new boundary of the Town of Oxford, may be inspected in the Town Office."

Early on it became apparent that not everyone in Oxford endorsed the objectives of the Resolution as introduced. Following initial publication of the Notice, certain members of the Oxford electorate prepared promptly a petition seeking to bring to referendum the Resolution, assuming apparently that it would be adopted ultimately by the Commissioners in substantially the same form as introduced. The petition (the "Petition") stated:

> We, the undersigned voters of the Town of Oxford, hereby petition to refer Resolution 1001 entitled "A RESOLUTION OF THE COMMISSIONERS OF OXFORD TO ANNEX SUBMERGED LANDS LOCATED UNDER CERTAIN PUBLIC WATERS ADJACENT TO THE TOWN BOUNDARIES IN ORDER TO REGULATE PLACEMENT OF WHARVES, PIERS, MOORING PILES, MOORING BUOYS, FLOATING DOCKS AND ASSOCIATED OR RELATED STRUCTURES" to a vote of the registered voters of the Town of Oxford for approval or rejection at an election to be held in accordance with Article 23A, Section 19 of the Annotated Code of Maryland.
>
> If the full text of the bill/ordinance or part of the bill/ordinance referred (the "proposal") does not appear on the back of this signature page or as an attachment, a fair and accurate summary of the substantive provisions of the proposal must appear on the back or to be attached, and the full text of the proposal must be immediately available from the petition circulator.

the second publication of the notices, and shall be held either within the boundaries of the municipal corporation or within the area to be annexed.

*NOTICE TO SIGNERS: Sign and print your name (1) as it appears on the voter registration list; OR (2) your surname of registration and at least one full given name AND the initial of any other names. Please print or type all other information other than your signature.*

(Emphasis in original.)

The Petition provided space for each signer to print his or her full name, registration address, signature, and date of signing. Not appearing on the face of the Petition was any instruction or advice regarding whether a signer could strike his or her signature, once affixed, and under what circumstances that could occur or how it might be accomplished physically. Circulation of the Petition began at some point after publication of the Notice, but before the public hearing was held and, therefore, prior to adoption of the Resolution.

On 22 September 2010, the Commissioners held the public hearing on the Resolution, which encompassed several hours of testimony (for and against the Resolution), as well as discussion of the details of and the reasons for the Resolution. At the conclusion of the hearing, the Commissioner held the record open for an additional ten days to receive any additional written comments.

The Commissioners adopted unanimously on 10 November 2009 the Resolution, without any material alteration from the version publicized in the Notice. Consequently, under the terms of the Resolution, 10 November 2009 was the date the Resolution was "finally enacted." In accordance with Article 23A, § 19(e),[6] the Resolution provided that it would become effective forty-five (45) days after the date of final enactment. In addition, pursuant to Article 23A, § 19(g), members of the Oxford electorate were able to "petition" for referendum the

---

6. Article 23A, § 19(c) provides:

(c) Enactment and effective date of resolution.—Following the public hearing, the legislative body may proceed to enact the resolution, in accordance with the usual requirements and practices applicable to its legislative enactments. The resolution shall not become effective until at least forty-five (45) days following its final enactment.

Resolution "any time within the 45 day period following the final enactment of the resolution." On 22 December 2009, forty-two (42) days after final enactment of the Resolution, the Petition was presented to the Commissioners.

The next day, Oxford's Town Clerk submitted the Petition to the Oxford Board of Supervisors of Elections (the "Board") for verification of the signatures, pursuant to Article 23A, § 19(g). The Board determined, in short order, that: (1) there were 616 registered voters in Oxford as of 25 December 2009; (2) the Petition contained 195 signatures, of which 177 were verified and valid signatures; (3) sixty-two (62) of the verified signatures were obtained after the final enactment of the Resolution; and (4), the remaining 115 signatures were acquired before final enactment, of which eighty-three (83) were obtained between the first date of publication of the Notice and the public hearing. The 177 verified signatures represented 28.73% of the qualified voters of Oxford, which was in excess of the twenty (20) percent needed to bring to referendum the Resolution pursuant to Article 23A, § 19(g). The ninety-four (94) signatures obtained after the public hearing was conducted, including the sixty-two (62) signatures obtained after final enactment of the Resolution, however, were insufficient by themselves to justify a referendum on the Resolution.

The Commissioners requested a legal opinion from the Office of the Attorney General of Maryland in aid of determining whether the signatures obtained prior to the final enactment of the Resolution could be counted properly to satisfy the threshold necessary to petition to referendum the Resolution and, alternatively, whether signatures obtained prior to the commencement of the public hearing could be used to satisfy that threshold. Before the advisory opinion could be issued, however, Koste filed his complaint in the Circuit Court, which sought declarations (1) that all of the 177 verified signatures were valid; (2) that all of the 177 signatures, including those obtained before the public hearing, may be counted to satisfy the threshold requirement contained in Article 23A, § 19(g); and, (3) that the number of valid signa-

tures represented at least twenty (20) percent of the registered voters in Oxford. The complaint further sought a writ of mandamus requiring the Commissioners, pursuant to Article 23A, § 19(g), to place the Resolution on the ballot and suspend the effectiveness of the Resolution, contingent upon the results of the referendum. The Commissioners filed an answer requesting an order declaring that the Petition failed to meet the legal requirements of Article 23A, § 19(g) and, as a result, the Resolution became effective on 26 December 2009. Soon after, Koste filed his motion for summary judgment.

The Circuit Court conducted a hearing on Koste's motion for summary judgment on 3 December 2010. Ultimately, the trial judge granted Koste's motion, determining that the requirement that citizens must "petition" within forty-five (45) days after final enactment of the Resolution "is there for the time within which the petition must be presented [to the Commissioners] and [does not have] any bearing on when the signatures are obtained, or whether the signatures are obtained prior to that 45 days." Finding that the plain language of Article 23A, § 19(g) did not require expressly that signatures be obtained only after final enactment of the Resolution and opining "we ought to give the people the opportunity to be heard," the judge held valid the verified signatures obtained before final enactment. Accordingly, the Circuit Court ordered the Commissioners to suspend the effect of the Resolution, contingent upon the results of a referendum vote.

The Commissioners noted timely an appeal to the Court of Special Appeals. In a reported opinion filed on 26 April 2012, a panel of the intermediate appellate court began its analysis by considering the plain language of Article 23A, § 19(g). *Town of Oxford*, 204 Md.App. at 586–88, 42 A.3d at 642–43. Determining that the statute's plain language "creates an ambiguity," the Court turned its consideration to the purpose of the forty-five (45) day period. *Id.* at 588–92, 42 A.3d at 643–45. It opined that, in light of Article 23A, § 19(d), which provides that a public hearing shall be scheduled within fifteen (15) days of the final publication of Notice, and Article 23A,

§ 19(*o* ), which provides that an annexation plan shall be open to public review at the hearing, it is likely that the Legislature intended for voters to have a chance to study the perhaps more fully developed issues at the public hearing before being approached by petition circulators. *Id.* at 589–91, 42 A.3d at 644–45. Moreover, the panel of the intermediate appellate court expressed concern about the possibility of voters signing a referendum petition regarding a resolution that could be revised substantially as a result of the public hearing, but before final enactment. *Id.* at 591, 42 A.3d at 645. The Court concluded:

> [B]ased on our examination of the text of the entire statute, its purpose and the consequences of Koste's proffered inter-pretation, we believe that the General Assembly intended the 45–day period of § 19(g) to be a restriction on the circulation of petitions that does not permit signatures to be gathered before final enactment of the resolution.

*Id.* at 592, 42 A.3d at 645.

As a result, the Court of Special Appeals: (1) reversed the judgment of the Circuit Court; (2) held that the Petition did not contain a sufficient number of valid signatures to submit to referendum the Resolution; and, (3) held that the Resolution became effective as enacted. *Id.* at 593, 42 A.3d at 646.

Koste filed a timely petition for a writ of certiorari. We issued a writ of certiorari on 20 August 2012 to consider the following question:

> Are signatures valid on a petition for referendum under Md.Code Ann. Article 23A, § 19(g) where the signatures were obtained after the publication of notice of the annex-ation resolution, the resolution was finally enacted without modification and the petition was presented to and filed with the chief executive and administrative officers of the town within 45 days after final enactment?

*Koste v. Town of Oxford,* 427 Md. 606, 50 A.3d 606 (2012).

## ANALYSIS

"On review of an order granting summary judgment, our analysis 'begins with the determination [of] whether a

genuine dispute of material fact exists; only in the absence of such a dispute will we review questions of law.'" *D'Aoust v. Diamond,* 424 Md. 549, 574, 36 A.3d 941, 955 (2012) (quoting *Appiah v. Hall,* 416 Md. 533, 546, 7 A.3d 536, 544 (2010)); *O'Connor v. Balt. Cnty.,* 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004). If no genuine dispute of material fact exists, this Court determines "whether the Circuit Court correctly entered summary judgment as a matter of law." *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.,* 404 Md. 560, 571, 948 A.2d 11, 18 (2008) (citations omitted). Thus, "[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is *de novo,* that is, whether the trial court's legal conclusions were legally correct." *D'Aoust,* 424 Md. at 574, 36 A.3d at 955.

There are no disputes of material fact in the present case, genuine or otherwise. Rather, the parties' disagreement revolves solely around a question of law, i.e., whether the signatures obtained by the petition circulators (Oxford voters themselves) prior to the public hearing and the final enactment of the Resolution may be counted toward petitioning the Resolution to referendum. *See Tribbitt v. State,* 403 Md. 638, 644, 943 A.2d 1260, 1263 (2008) (When an issue "involves an interpretation and application of Maryland constitutional, statutory or case law, an appellate court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review."); *see also Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175, 184 (2006).

As we observed recently in *Whitley v. Maryland State Board of Elections,* 429 Md. 132, 149, 55 A.3d 37, 47–48 (2012):

The primary goal of statutory construction is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision[.]" *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007). In so doing, we look first to the "normal, plain meaning of the language of the statute," read as a whole so that "no word, clause, sentence or phrase is rendered surplusage, superfluous,

meaningless or nugatory[.]" *Doe v. Montgomery County Bd. of Elections,* 406 Md. 697, 712, 962 A.2d 342, 351 (2008) (quoting *Barbre,* 402 Md. at 172, 935 A.2d at 708). If the language of a statute is clear and unambiguous, we "need not look beyond the statute's provisions and our analysis ends." *Barbre,* 402 Md. at 173, 935 A.2d at 709. Where the language of the statute is ambiguous and may be subject to more than one interpretation, however, we look to the statute's legislative history, case law, purpose, structure, and overarching statutory scheme in aid of searching for the intention of the Legislature. *Doe,* 406 Md. at 712, 962 A.2d at 351.

 Our analysis begins, as did that of the Court of Special Appeals, by looking to the plain meaning of the statutory language in question. The process by which we ascertain the plain meaning of a statute is guided by the following precepts:

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

*Bd. of County Comm'rs v. Marcas, L.L.C.,* 415 Md. 676, 685, 4 A.3d 946, 951 (2010) (quoting *Lockshin v. Semsker,* 412 Md. 257, 275–76, 987 A.2d 18, 29 (2010)).

 Article 23A, § 19(g), governs the process by which a municipal corporation may annex land not yet within its boundaries. The parties in this case, each relying on grammatical nuances, assert that the language of Article 23A, § 19(g) supports unambiguously their respective interpretations of the statute. Article 23A, § 19(g) provides:

Petition for referendum by residents of municipality.—At any time within the forty-five (45) day period following the final enactment of the resolution, a number of persons equal to not less than twenty per centum (20%) of the qualified voters of the municipal corporation may, in writing, petition the chief executive and administrative officer of the municipal corporation for a referendum on the resolution. Upon the presentation of a petition to the officer, he shall cause to be made a verification of the signatures thereon and shall ascertain that the persons signing the petition represent at least twenty per centum (20%) of the qualified voters of the municipal corporation. Upon verifying that the requirements of this subsection have been complied with, the officer shall by proclamation suspend the effectiveness of the resolution, contingent upon the results of the referendum.

Koste argues, "[i]t is clear from reading this entire section as a whole" that the phrase "may, in writing, petition" refers to the act of presenting a written petition. Under this view of the statute, it would be of no moment, once a resolution is introduced, when the signatures on a petition were obtained as long as a petition with the requisite number of signatures was presented to the designated body within forty-five (45) days of the final enactment of the pertinent legislative act.

In support of this interpretation, Koste notes that the statute lacks language requiring expressly that voters sign a referendum petition only after final enactment of an annexation resolution. Koste notes further that the sentence immediately after the sentence containing "may, in writing, petition" begins with the phrase "[u]pon the presentation of a petition." Koste contends that, applying parity principles of English grammar, the term "petition" in the first sentence of Article 23A, § 19(g) is equivalent to the term "presentation of a petition" in the second sentence of Article 23A, § 19(g). In addition, Koste presses the notion that Article 23A, § 19(g) does not direct the officers of municipal corporations to verify that the signatures were collected within any specified time frame upon receiving a referendum petition, but instead re-

quires the officers to verify only that the petition contains twenty (20%) percent of the qualified voters in the municipality. This, in Koste's view, supports the premise that the Legislature did not intend in the relevant statutory scheme to require that the petitioning process begin only after enactment of the Resolution (or completion of the public hearing).

In contrast, the Commissioners argue that the phrase "may, in writing, petition" embraces more than the mere physical act of presenting a petition; rather, it encompasses the entire process of petitioning the Resolution to referendum. Under this interpretation, the entire petitioning process (circulating petitions, obtaining signatures, and submitting the petitions) must be completed solely within the forty-five (45) days between final enactment of the Resolution and the effective date of the Resolution.

In support of their interpretation of the statute, the Commissioners direct our attention to Article 23A, § 19(d) and (e), which require the municipality's legislative body to advertise publicly and conduct a public hearing on a proposed annexation resolution before the resolution may be enacted. The Commissioners would have us focus also on Article 23A, § 19(*o* ),[7] which provides that an annexation plan, containing a

---

**7.** Article 23A, § 19(*o* ) provides, in relevant part:

(*o* ) Annexation plans.—

(1) In addition to, but not as a part of the resolution, the legislative body of the municipal corporation shall adopt an annexation plan for the area proposed to be annexed.

(2) The annexation plan shall be open to public review and discussion at the public hearing, but amendments to the annexation plan may not be construed in any way as an amendment to the resolution, nor may they serve in any manner to cause a reinitiation of the annexation procedure then in process.

(3) (i) A copy of the annexation plan shall be provided to the governing body of the county or counties in which the municipal corporation is located, the Department of Planning, and any regional and State planning agencies having jurisdictions within the county at least 30 days prior to the holding of the public hearing required by this section.

(ii) Except as provided in paragraph (4) of this subsection, for annexations that begin before October 1, 2009, the annexation plan shall contain a description of the land use pattern proposed for the

description of the land use pattern proposed for the area to be annexed, will be made available for public viewing at the hearing. The Commissioners assert that the public hearing provisions of the statute would be rendered superfluous, or at least marginalized, if the referendum process could begin before the hearing was held because it would enable voters to make a decision whether to seek a referendum before they received complete information about the proposed annexation. The Commissioners conclude that requiring the petitioning process to begin after final enactment of the annexation resolution would give effect to the purposes of the public hearing provisions of the annexation statute, which are designed to inform completely voters about a resolution before they decide whether they wish to petition the resolution to referendum.

■■■ When the plain language of a statute is "subject to more than one reasonable interpretation," the statutory language is ambiguous. *Lockshin,* 412 Md. at 276, 987 A.2d at 29. Here, both Koste and the Commissioners proffer distinct interpretations of Article 23A, § 19(g). We conclude that the language of Article 23A, § 19(g) is ambiguous because we conclude both of these interpretations of the statute are, at the threshold, reasonable. The Court of Special Appeals reached the same conclusion.

There is merit in Koste's view that, under accepted principles of English grammar, the phrase "may, in writing, petition" refers to the act of presentment of a petition to the legislative body. That merit, however, derives somewhat from

---

area to be annexed, which may include any county master plan already in effect for the area. It shall be presented so as to demonstrate the available land for public facilities which may be considered reasonably to be necessitated by the proposed use, such as school sites, water or sewage treatment facilities, libraries, recreation, fire or police. It shall contain also a statement describing the schedule for extending to the area to be annexed each municipal service performed within the municipality at the time of annexation and a statement as to the general methods by which the municipality anticipates to finance the extension of municipal services into the area to be annexed.

viewing the phrase in isolation from the rest of the statutory scheme of Article 23A, § 19. The plain language of a statutory provision is not considered in isolation, however, but rather "the plain language must be viewed within the context of the statutory scheme to which it belongs." *Lockshin*, 412 Md. at 276, 987 A.2d at 29. When the statutory language is read with Article 23A, § 19(d), (e), and (*o* ) in mind, it becomes perhaps more reasonable to interpret "may, in writing, petition" as encompassing the entire petitioning process. This is because such an interpretation gives greater effect to the public hearing provisions designed to inform more fully the electorate about the overall effects of a proposed annexation resolution.

Nonetheless, concluding that the plain language of Article 23A, § 19(g) is ambiguous, we turn our attention to other indicia probative of legislative intent. As we stated in *Doe*, "[w]here the language of the statute is ambiguous and may be subject to more than one interpretation, however, we look to the statute's legislative history, case law, purpose, structure, and overarching statutory scheme in aid of searching for the intention of the Legislature." 406 Md. at 712, 962 A.2d at 351.

## I. Legislative History

The legislative history of the annexation statute is of no assistance in our analysis. Article 23A, § 19(g) was enacted in 1955 by the General Assembly. There have been no material changes to the relevant statutory language since then. The legislative history of Article 23A, § 19(g) is scant. In our search for relevant legislative history regarding Article 23A, § 19(g), we found no records that provided any insight as to whether the Legislature contemplated the petitioning process beginning before final enactment of (or the public hearing regarding) an annexation resolution, or whether the Legislature contemplated for the petitioning process to begin only after final enactment. Moreover, neither party directed our attention to any such records.

## II. Case Law

Koste points to *Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake*, 392 Md. 301,

896 A.2d 1036 (2006), in support of his interpretation of Article 23A, § 19(g). *Oakland* involved dueling annexations of the same land by two competing municipalities. 392 Md. at 305–09, 896 A.2d at 1039–41. Which municipality enacted first and lawfully its annexation resolution was key to which would prevail. The *Oakland* Court addressed how many days after the final day of the public notice advertising must pass before a public hearing on an annexation resolution may be held under Article 23A, § 19(d). *Id.* at 309–21, 896 A.2d at 1041–48. The Court determined that the date of the final public notice should be excluded in the computation of the relevant fifteen (15) day period, but that the fifteenth day after the date of the final public notice may be included in the computation under Article 23A, § 19(d). *Id.* The Court addressed then whether a referendum election may occur before the expiration of the forty-five (45) day period during which referendum petitions may be collected under Article 23A, § 19(g), if the legislative body of a municipality receives a valid referendum petition before the forty-five (45) day period concludes. *Id.* at 321–28, 896 A.2d at 1041–52. The Court held that "the plain language of the referendum provisions of Art. 23A § 19, subsections (f)-(h), makes clear that the General Assembly intended for a referendum election to occur after the [full] forty-five day period following the enactment of the annexation resolution." *Id.* at 326, 896 A.2d at 1051.

Although *Oakland* did not address the question of whether signatures on a referendum petition may be obtained before final enactment of an annexation resolution, Koste asserts that the case provides persuasive support for his interpretation of the statute. As Koste points out, the *Oakland* Court stated:

> The intent of the General Assembly is clear. It provided for the submission of referendum petitions "at any time" within the forty-five days following the enactment of an annexation resolution by the residents of the area to be annexed, the residents of the annexing municipality, and officials of the county governing body in which the municipality is located. See Art. 23A § 19(f)-(h).

*Id.* at 326, 896 A.2d at 1051. He asserts that the *Oakland* Court was suggesting that the presentation of a referendum petition must occur within the forty-five (45) day period, but the forty-five (45) days did not circumscribe necessarily the entire petitioning process.

Koste notes further that the referendum petition in *Oakland* may have been circulated to voters for signatures several weeks before the public hearing was conducted. *See* 392 Md. at 306, 896 A.2d at 1039 ("Several weeks before the public hearing on the Mountain Lake Park resolution, the Town Clerk of Mountain Lake Park prepared a referendum petition that was circulated to the residents."). In addition, the referendum petition, with the requisite number of signatures, was filed apparently with Mountain Lake Park the day after the public hearing. *See id.* at 306, 896 A.2d at 1039 (the date of the public hearing was 28 April 2004 and public notice of the referendum election was published on 29 April 2004). Koste believes that these "facts" in *Oakland* demonstrate that the *Oakland* Court approved of petition circulation before final enactment of an annexation resolution.

Like the Court of Special Appeals, we find Koste's argument in this regard unpersuasive. The question answered in *Oakland* was unrelated to the validity of obtaining referendum petition signatures before final enactment of an annexation resolution. Thus, even if referendum petition signatures were collected weeks before final enactment of the annexation resolution at issue in *Oakland,* it does not follow that the *Oakland* Court was sanctioning such a practice because that question was not "teed-up" in *Oakland.* Moreover, as the Court of Special Appeals pointed out quite correctly, a number of other statements in *Oakland* undercut Koste's reading of the Court's opinion. *Town of Oxford,* 204 Md.App. at 592–93, 42 A.3d. at 646. For example, the *Oakland* Court noted: "[b]y operation of Art. 23A § 19(f)-(h), each constituency receives a fixed period of time during which to consider the proposed annexation, *circulate a petition for referendum,* and ultimately, present a petition for referendum to the municipality." 392 Md. at 326–27, 896 A.2d at 1051–52 (emphasis added). This

could be read to suggest that perhaps *both* the circulation and the presentation of a petition for referendum must occur during the forty-five (45) day period after final enactment of an annexation resolution.

### III. Purpose

We consider next the legislative purpose behind the forty-five (45) day post-enactment period, taking into consideration the "context, related statutes, or [ ] statutory scheme" in which it appears. *Md.–Nat. Capital Park & Planning Comm'n v. Anderson,* 395 Md. 172, 182–83, 909 A.2d 694, 700 (2006). The Court of Special Appeals stated, in regard to the referendum process:

> The presumed rationale for a limited circulation period is most likely the same for any substantial restriction on the referendum or initiative. Because referendum and initiative displace the acts of a representative body, the process was not 'intended to be easy to fulfill.'

*Town of Oxford,* 204 Md.App. at 588–89, 42 A.3d. at 643–44.

We echo the Court of Special Appeals's sentiment that the referendum process is intended to be a rigorous one to complete and the hurdles that stand in the way of a referendum are meant to be cleared only by voters who demonstrate a high level of diligence. *See Oakland,* 392 Md. at 332, 896 A.2d at 1055 (noting that, in a municipal annexation, "[t]he referendum process is not easy. Often it is a very difficult process to obtain the necessary number of signatures during the allotted period of time . . .") (Cathell, J. concurring); *see also Tyler v. Secretary of State,* 229 Md. 397, 402, 184 A.2d 101, 104 (1962) ("[T]hose seeking to exercise the right of referendum in this State must, as a condition precedent, strictly comply with the conditions prescribed."). The General Assembly, in imposing substantial requirements and restrictions on the referendum process generally, was mindful of the legitimate concern that legislative governance could be slowed down dramatically if referendum elections were too frequent occurrences. If referendum elections were to become a more routine occurrence, it would take substantially longer and

exhaust substantially more resources for laws to become enacted (if at all), thus stagnating potentially the legislative process. *See Oakland,* 392 Md. at 332, 896 A.2d at 1055 ("[I]f the petition is accomplished appropriately and defended during the signature verification process, there remains a very costly and time consuming political process leading up to the referendum election.") (Cathell, J. concurring). Consequently, when the General Assembly intends to impose a substantial restriction on the referendum process, that purpose will not be disturbed by the Judiciary, except upon the clearest justification and grounds.

The Commissioners assert that the legislative purpose behind the forty-five (45) day period was to provide a fixed time within which voters could circulate a referendum petition to their fellow voters, who had been given previously the opportunity to consider fully the strengths and weaknesses of a given annexation resolution after the resolution was advertised publicly, a public hearing conducted, and the resolution enacted finally. In support of their position, the Commissioners point to other parts of the annexation statute, as well as certain inherent realities of the annexation process. For example, Article 23A, § 19(*o* ), as noted earlier, provides that an annexation plan, containing additional information (not contained in the resolution necessarily), such as a description of the land use pattern proposed for the area to be annexed, shall be made available at the public hearing. Article 23A, § 19(*o* ) further provides that "amendments to the annexation plan may not be construed in any way as an amendment to the resolution, nor may they serve in any manner to cause a re-initiation of the annexation procedure then in process." Thus, voters who sign referendum petitions as to the advertised resolution before the public hearing may do so without complete information about the fuller import of the proposed annexation than as may be disclosed solely in the resolution. Moreover, the Commissioners contend that, as practical realities, the zoning process for newly-annexed land "routinely occurs after the introduction of the annexation resolution, but prior to the final enactment of the annexation resolution."

Moreover, annexation agreements, in which the municipality negotiates the terms and conditions of the annexation (e.g., zoning and dedication of public streets), "are often executed immediately prior to the vote by the legislative body on the resolution." In light of these realities, the Commissioners assert that the General Assembly could not have contemplated authorizing petition circulators to solicit voters to sign referendum petitions at a time when the voters may not be informed as fully as possible about the greater implications of the proposed annexation resolution.

Koste ripostes that voters should be permitted to sign referendum petitions before the debate at a public hearing is conducted and the annexation resolution is enacted, even though the voters may not have access yet to more complete information about the proposed annexation. He notes that every petition signer has the right to withdraw his or her signature at any time. *See Ficker v. Denny,* 326 Md. 626, 633–34, 606 A.2d 1060, 1063–64 (1992) ("Embodied in Article XI–A, § 5, of the Constitution is the principle that individual citizens of a county will have a direct say in their fundamental law, i.e., their charter. In light of this principle, citizens have a right to sign a petition as well as a right not to sign or to withdraw their names from a petition. The right is an individual one which can only be exercised by the signer. . . . [S]igners have a right to withdraw their names from a petition if they no longer support it."). In fact, the Board's Certification in the present case reflects that one petition signer withdrew his or her name by crossing it off a petition, though the record fails to disclose when or where this was accomplished. Thus, where a voter signs a referendum petition before a public hearing is conducted or final action occurs, Koste contends that the voter would have an opportunity to withdraw his or her signature before the petition is submitted, in the event that information is disclosed to the voter, during or after the public hearing, that convinces the voter to change his or her decision to endorse the resolution going to referendum. Of course, how well known this right is among the petition signers is debatable. As noted earlier, the Petition circulated

in the present case does not inform or advise signers generally of this right or how it may be effectuated.

Koste notes that the Resolution in the present case was not altered, amended, or otherwise modified from the first notice publication date through final enactment by the Commissioners. As a result, because every petition signer executed the Petition after the first publication of the Notice, each signer was aware effectively of what was provided in the Resolution (as enacted), concluding that a referendum was warranted. Thus, the rationale for holding that referendum petitions must be circulated only after a resolution has been enacted is inapposite to the circumstances of the present case, where there can be no concern that any voter signed his or her name without having an appreciation of the pertinent information in the enacted Resolution. To the extent that this argument is of the "no harm, no foul" variety, we reject it. *See supra* at n. 3, op. at 17–18, 63 A.3d at 584. Such an argument begs the question of what was intended by Article 23A, § 19(g). Moreover, this argument is unresponsive to the Commissioners's legitimate concerns about the intended significance of the public hearing provisions of the relevant statutory scheme and the additional information that may be obtained there by the earlier signers of the Petition.

Based on our examination of the entire annexation statutory scheme, we agree with the Court of Special Appeals's conviction that the General Assembly intended the forty-five (45) day period of Article 23A, § 19(g) to act as a substantial restriction on when petitions may be circulated. The General Assembly intended for the post-enactment forty-five (45) day period to act as a beginning and ending period for the petition circulation and submission process.

In concluding that the forty-five (45) day period was intended to be a restriction on the circulation of petitions, which does not permit signatures to be gathered before final enactment of the resolution, the Court of Special Appeals was concerned that voters would sign referendum petitions for a resolution that departs substantially from what is enacted finally. *Town*

*of Oxford,* 204 Md.App. at 591, 42 A.3d. at 645. The intermediate appellate court stated: "The circuit judge's belief, that the petition's signers would have 'more time to think about' the resolution before the public education begins, seems completely unrealistic." *Id.* at 590, 42 A.3d at 644. We agree, but only somewhat. Although it may not be "completely unrealistic" to expect that voters will make use actually of the opportunity to withdraw their signatures if they change their minds for any reason (because the evidence in this record indicates that at least one voter did withdraw his or her signature, albeit under unclear circumstances), the combination of the Petition not informing signers of this right and the uncertainty that this right is generally understood by the public bolsters in our minds the persuasiveness of the Commissioners's interpretation of the statute as the Legislature placing a premium on the public hearing and enactment elements.

The law favors seemingly a presumption that voters will inform themselves fully of all accessible information before making a decision. *See Stop Slots MD 2008 v. State Bd. of Elections,* 424 Md. 163, 169, 207–12, 34 A.3d 1164, 1167, 1190–93 (2012) (holding that because voters had access to the full language of a proposed constitutional amendment and legislation contingent upon the ratification of the amendment by the electorate, "the average voter [was] reasonably [ ] well informed of the changes proposed by the amendment and the effect of the provisions of the contingent legislation"). This notion is served best in the present case by construing the statute as committing the petition circulation and submission process to the forty-five (45) day period following enactment of a resolution because it is only after final enactment that the law may presume that voters are informed fully about all the pertinent information of a given resolution and, consequently, are in the best position possible to make a decision about whether to petition a resolution to referendum. A corollary to the presumption that voters will inform themselves fully when making a decision is that voters will not be informed fully when making a decision without having access to all pertinent

information. Article 23A, § 19(d) indulges this corollary by prohibiting voters from signing referendum petitions before the public hearing is held and final enactment occurs and, thus, at a time when the voters are not informed fully of all the pertinent information relating to the resolution. Due to the doubts about the degree to which voters may be aware of the right to withdraw their signatures on petitions, it is unsafe to presume that a voter will act with sufficient diligence to withdraw his or her name from a referendum petition in the event that his or her decision changes, nor do we believe that the General Assembly intended to indulge such a presumption. Consequently, we reject Koste's assertion that voters should be permitted to sign referendum petitions before the public hearing is conducted and the annexation resolution is enacted, even though the voters may not have access yet to more complete information about the proposed annexation, solely because the voters have an "opportunity" to withdraw their signatures before the petition is submitted.

We hold therefore that the General Assembly intended for the forty-five (45) day period of Article 23A, § 19(g) to bar the circulation of referendum petitions prior to the final enactment of a resolution. Consequently, the Court of Special Appeals was correct in concluding that, under Article 23A, § 19(g), petition signatures gathered after introduction, but prior to commencement of the forty-five (45) day period after final enactment of the Resolution, could not be counted toward petitioning the Resolution to referendum. By not counting pre-enactment signatures, the referendum effort did not succeed in obtaining a sufficient number of petition signatures for a referendum election to be held. The Resolution should have been declared effective as of 26 December 2009. Thus, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

BATTAGLIA, J., joins in judgment only.

BELL, C.J., and ADKINS, J., dissent.

ADKINS, J., dissenting.

I respectfully dissent because the majority ignores the plain meaning of Article 23A, choosing instead to add words to the statute, and insert an arbitrary beginning date for collection of petition signatures. The majority considers this addition justified under the general principle that "[b]ecause referendum . . . displace[s] the acts of a representative body, the process was not 'intended to be easy to fulfill.' " Maj. Op. at 33, 63 A.3d at 594 (quoting *Town of Oxford v. Koste,* 204 Md.App. 578, 588–89, 42 A.3d 637, 643–44 (2012)). I submit that a better reading of the statute is that reached by the Circuit Court, which discerned that "the primary purpose of the statute is to provide an exit point, and not a beginning point for the process."

As I write, I keep the text of Article 23A, Section 19 glued to my computer screen:

> (g) *Petition for referendum by residents of municipality.*—**At any time within the forty-five (45) day period** following the final enactment of the resolution, a number of persons equal to not less than twenty per centum (20%) of the qualified voters of the municipal corporation **may, in writing, petition the chief executive and administrative officer of the municipal corporation for a referendum on the resolution. Upon the presentation of a petition to the officer,** he shall cause to be made a verification. . . . (Emphasis added).

Md.Code (1957, 2011 Repl.Vol.), Article 23A, § 19(g). There is nothing in this section prohibiting the circulation of petitions before a given date—either the date of the public hearing or the enactment of the resolution. The majority posits:

> When the statutory language is read with Article 23A, § 19(d), (e), and (*o* ) in mind, it becomes perhaps more reasonable to interpret "may, in writing, petition" as encompassing the entire petitioning process. This is because such an interpretation gives greater effect to the public hearing provisions designed to inform more fully the electorate about the overall effects of a proposed annexation resolution.

Maj. Op. at 30, 63 A.3d at 592. This may or may not be a valid goal, but the legislature did not adopt it, and the majority's endorsement of it constitutes judicial editing of the statute. The legislature, with all of its experience and resources, surely understood that it could put a start date as well as an end date on the collection of signatures for the petition. It certainly understood, as well, that opponents to a proposed legislation would often be dancing and fidgeting like racehorses at the starting gates, anxious to begin the circulation race.

With a full understanding of the politics of collecting signatures to support a petition for referendum, if the legislature considered it important to hold back these avid petition circulators until after the public hearing, it surely would have said so. Section 19(e), instead, focuses on deferring the effective date of a resolution "until at least forty-five (45) days following its final enactment." In setting this end date 45 days later, I contend that the legislature was focused on expediting the process—ensuring that the referendum process be over as soon as reasonably possible—not prohibiting the signing of a petition before an arbitrary start date.

The "plain meaning" doctrine, so often called upon in statutory interpretation cases, rests largely on the notion that written language is the best indicator of legislative intent. But it also serves another purpose—when a citizen is reading the statute, he should be able to know how to comply with its requisites. Those citizens of Oxford who opposed the annexation, had they looked at this statute, would have had no reason to know that they were barred from beginning the collection of signatures right after the publication of the notice of the proposed resolution (containing the date and time of the hearing on the resolution). All they would have seen was that the requisite 20% of voters had to sign their petition so that they could, "in writing, petition the chief executive and administrative officer of the municipal corporation for a referendum on the resolution" within 45 days of the final passage. Art. 23A, § 19(g). There is nothing in the statute that says the petition signers could not sign before the final enactment.

Yet, without a crystal ball showing that the majority of this Court would erect that entry gate, thereby disqualifying them, the citizens of Oxford had no reason to re-sign the petition after the final enactment of the resolution. A reasonable person would not agree with the majority's interpretation that the language of Section 19(g)—providing that "[a]t any time within the forty-five (45) day period . . . not less than [20%] of the qualified voters . . . may, in writing, petition"—means that no signatures may be obtained before the public hearing. In imposing this start date, the Court has unfairly deprived these citizens of the right to petition for referendum.

I submit that application of the majority's "rigorous" interpretation of the statutory "hurdles" rationale, *see* Maj. Op. at 33–34, 63 A.3d at 594, which is essential to its conclusion, flatly contradicts our recent referendum decision in *Whitley v. Maryland State Board of Elections*, 429 Md. 132, 55 A.3d 37 (2012). This new "protect the hurdles" rationale fundamentally calls for a strict construction of the referendum statute, in favor of no referendum. Yet in *Whitley*, without regard for "protecting the hurdles" that stand in the way of a referendum, a majority of the Court took a most lenient view of the statutory requirements. Interpreting the requirement "that there shall be attached to each paper of signatures . . . an affidavit of the *person procuring* those signatures that the signatures were *affixed in his presence[,]* " the Court held that the circulator "procuring" petition signatures "in his presence" could be one-and-the-same as the actual signer of the petition—so that a circulator may procure his own signature in his own presence. *Id.* at 157, 160–63, 55 A.3d at 52, 54–56. Thus, the Court in *Whitley* adopted the most lenient rationale possible, making it much easier for the referendum proponents to succeed.

This Court should provide consistent guiding principles for interpretation, not act on an ad hoc basis. If we interpret referendum statutes liberally, to favor referendum, as in *Whitley*, let us do that consistently. If we interpret referendum statutes strictly, to favor the legislative will over that of the people, as the majority does here, let us do that consistently.

It is not fair to citizens and their legal advisors, for us to hop from one rationale to the other.

Respectfully, I urge that we hold that the petition signatures gathered after introduction of the resolution, but prior to final enactment of the resolution, be counted, thereby bringing the tally of the signatures up to and beyond the required 20%. The referendum should go forward.

I have been authorized by Chief Judge Bell to state that he joins in this dissent.